**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Shataan ADAMS, Appellant.**

Superior Court of Pennsylvania.

Argued May 25, 2011.
Filed Jan. 20, 2012.

William P. Wismer, Media, for appellant.

Jay W. Hannon, Assistant District Attorney, Media, for Commonwealth, appellee.

BEFORE: STEVENS, P.J., SHOGAN, and ALLEN, JJ.

OPINION BY ALLEN, J.:

Shataan Adams ("Appellant") appeals from the judgment of sentence imposed following his convictions for second-degree

murder, burglary, aggravated indecent assault, and criminal conspiracy to commit robbery.[1] We affirm the trial court's determination that Appellant's constitutional right to silence was not violated in this case. We also conclude that the Commonwealth presented sufficient evidence to support Appellant's aggravated indecent assault conviction. However, we find that the trial court imposed an illegal sentence, and therefore we vacate the judgment of sentence and remand for resentencing.

The trial court summarized the pertinent facts as follows:

This case arises from the murder of, [the victim]. The events culminating in [the victim's] death are as follows. At the time of the incident, the [victim's] family lived [in the Highlands Garden area of the City of Chester, Delaware County]. In August of 2007, the [victim and his] family purchased a Lincoln Navigator, which subsequently developed mechanical malfunctions. The dealership from which the vehicle was purchased loaned the [victim and his family] approximately four vehicles between August and September 2007, since the Navigator was covered under a full warranty. The ephemeral nature of these multiple vehicles, in addition to [the victim's] visibly Rastafarian ideology seemingly piqued the interest of the neighborhood. Appellant and co-defendants Byron Hammond and Charles Redfain, all residents of the Highland Gardens area, were particularly intrigued by [the victim's] activities. On multiple occasions, Dyeisha Wallace—a neighbor of the [the victim and his family]—overheard Hammond and Redfain discuss robbing [the victim]. On one particular occasion, while the [the victim and his family] drove down the street, Hammond commented to Redfain,

"Damn, they can't figure out what kind of car they want to keep," and also articulated his intention to rob them.

On approximately September 21, 2007, an altercation occurred between [the victim] and Redfain. Redfain approached [the victim], and the two proceeded to smoke marijuana together. As Redfain reached for one of [the victim's] rolling papers, a fight broke out and the two began wrestling. At some point following this quarrel, Redfain went to Ms. Wallace's house to inquire about the [the victim's] vehicle situation. Redfain also testified that on separate occasions he had clocked [the victim's] movements: gauging when he entered and departed his household, and observing the types of vehicles he drove. Also, the three men had allegedly been planning to steal marijuana and money from the [the victim's] residence, and to split up the proceeds in equal shares.

The day in question, September 27, 2007, was an atypical day for the [victim's] family, and one which would forever change the composition of their household. [M.B.], wife of [the victim] and a full-time school teacher in the Philadelphia School District, attended back-to-school night at her place of employment. [The victim] picked up [M.B.] around 8:00 p.m.; when they arrived home, Clive Cummings—a lifelong friend of [the victim's] who he had not seen in a few months—greeted them. At approximately 8:45 p.m., Cummings and [the victim] left in Cummings' car to get gasoline and reminisce, while [M.B.] went into the family's home and attended the nighttime routine for their young children.

Unbeknownst to the [victim's] family, [Appellant], Hammond, and Redfain

---

1. 18 Pa.C.S.A. §§ 2502(b); 3502(a), 3125, 903 and 3701(a)(1)(ii), respectively

were simultaneously plotting a robbery of the [victim's] home. On September 27, 2007, Redfain and [Appellant] were hanging out—smoking marijuana and drinking beer—on the side of "John John's house", located on Price Street. As nighttime approached, Hammond approached and exclaimed to the other, "It's about to go down." Hammond gave Redfain a shotgun, and [Appellant] gave Redfain a mask. Hammond and [Appellant] each possessed firearms of their own.

The testimony of Ms. Wallace corroborated the group's intention to rob the [the victim]. On her walk home from work, at approximately 8:30 p.m., Ms. Wallace passed by "John John's" and observed several notable occurrences on Price Street. She noticed Redfain dressed in all black attire. She also noticed Hammond approach him wearing a black hooded sweatshirt, which she found peculiar due to the warm summer weather. [Appellant] approached the two. Redfain then inquired, "Are you all ready?" to which Hammond responded, "Nigger are you ready?" Hammond then asked [Appellant] "Are you in this with us?" Ms. Wallace then witnessed the group walk down Price Street towards the [victim's] home, where she lost sight of them.

At approximately 10:00 p.m., after [M.B.] had bathed her children; she was lying in her bed with them when she heard a loud noise downstairs. This was the thunderous crack of Hammond kicking in [her] back door. Complete mayhem ensued as [Appellant], Hammond and Redfain entered the [victim's] residence. As [M.B.] peered downstairs, she "saw three men coming up the stairs with guns." Hammond then yanked [M.B.] by her hair, away from her children, and pulled her downstairs to the kitchen area. Hammond placed [M.B.]

face down on the kitchen floor, striking her repeatedly, and continually demanding that she produce money and marijuana. Although [M.B.] gave the perpetrators $160 and explained that she did not have any drugs, [Appellant] and Redfain ransacked the first floor of the [the victim's] residence, searching for drugs and money, while Hammond controlled her and demanded more money. At some point during the burglary, once [Appellant] and Redfain had returned to the kitchen, [M.B.]'s panties were ripped off, and Redfain digitally penetrated her.

Even though she was on the floor, [M.B.] was able to discern the appearances—the facial features, clothing, and hairstyles—of the three individuals in her home, since the kitchen was illuminated by the living room and utility room lights. [M.B.] observed three African American males: one individual wearing a ski mask and dark clothing pointing a shotgun; one individual with lighter skin and of shorter stature than the others, with small twists in his hair, holding a handgun; and a darker-skinned individual wearing a bandana and a baseball hat, also carrying a small handgun.

During this period of turmoil, Cummings and [the victim] arrived back at the [victim's] home in Cummings' truck. Inside the house, [Appellant] alerted the other perpetrators that [the victim] had arrived and ordered them to "tie the bitch up." The three intruders then prepared to ambush [the victim] once he entered. [Appellant] shut off the utility room light, Hammond shut off the kitchen light, they attempted to place [M.B.] in the back yard, and positioned themselves in the dark with their weapons drawn. Concerned for the safety of her husband, [M.B.] freed herself from the grip of one of her captors, punched her

right hand through a window, and screamed out in order to alert [the victim] not to come inside. As [M.B.] ran out of the front door screaming, [the victim] grabbed Cummings' firearm; [M.B.] entered the passenger side of Cummings' vehicle simultaneously to the sound of gunshots fired from the residence. As Cummings observed the muzzle flashes of firearms emanate from the front door of the [victim's] home, he sped off with [M.B.] in the passenger seat, leaving [the victim] behind. Redfain and Hammond continued to discharge their firearms at [the victim]. While circling the block in his vehicle, Cummings called 9–1–1. When Cummings and [M.B.] arrived back at the [victim's] residence, they observed [the victim] lying on the ground, suffering from a bullet wound to the head.

Dr. Frederic Hellman, admitted as an expert witness in forensic pathology on behalf of the Commonwealth, conducted an autopsy of [the victim] and subsequently prepared a postmortem report and medical examiner findings. Dr. Hellman testified that to a reasonable degree of scientific certainty, [the victim's] cause of death was a single gunshot wound to the head, and he determined the manner of death to be homicide.

Trial Court Opinion, 12/8/2010, at 1–6 (footnotes and citations to notes of testimony omitted).

On May 8, 2009, following a trial during which Appellant did not testify on his own behalf, a jury found Appellant guilty of the aforementioned crimes. On July 14, 2009, the trial court sentenced Appellant to life imprisonment on the charge of second-degree murder, a consecutive twenty years for robbery, and a consecutive ten to twenty years for burglary. Appellant filed a timely notice of appeal. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant raises the following issues for our review:

1. Did the trial court commit error and abuse of discretion in allowing testimony of Appellant's pre-arrest invocation of his right not to incriminate himself?

2. Was the Appellant's conviction for the crime of indecent assault, based on insufficient evidence?

3. Did the trial court impose an illegal sentence for the crime of burglary, the underlying felony for Appellant's Second Degree Murder (felony murder) conviction, where the sentence was imposed consecutively to the sentence for Second Degree Murder?

Appellant's Brief at 4.

### 1. *Appellant's Constitutional Right to Silence*

In his first issue, Appellant challenges the trial court's admission of testimony from Sergeant John Gretsky of the Chester Police Department, concerning Appellant's pre-arrest refusal to speak with Sergeant Gretsky when the sergeant attempted to interview him. Appellant's Brief at 15–22. Appellant argues that Sergeant Gretsky's testimony and the Commonwealth's subsequent references thereto, violated Appellant's right to remain silent pursuant to Article 1 § 9 of the Pennsylvania Constitution and the Fifth Amendment of the Constitution of the United States. Appellant also contends that the testimony was highly prejudicial, and that its admission did not constitute harmless error. *Id.* at 2.

Appellant expressly challenges the following testimony:

Assistant District Attorney: During your investigation, did you have the occasion to locate [Appellant]?

Sergeant Gretsky: Yes.

\* \* \*

Assistant District Attorney: And did you attempt to interview [Appellant]?

Sergeant Gretsky: Yes we did; however, he didn't want to speak to us at that time.

Assistant District Attorney: Did you identify yourselves as law enforcement?

Sergeant Gretsky: Yes. We identified ourselves and told him that we'd like to interview him in reference to the [victim's] homicide and that his name came up in the matter.

Assistant District Attorney: And in response to that what did he say?

Sergeant Gretsky: He said he had nothing to say.

Assistant District Attorney: What then—did you have a further conversation with him?

Sergeant Gretsky: Yes. We also asked him to consent to provide us with a DNA sample with the use of a DNA collector at which time he agreed.

N.T., 5/7/09, at 251–252.

Appellant's counsel promptly objected to the foregoing testimony, arguing that Sergeant Gretsky's references to Appellant's silence violated Appellant's constitutional rights. In pertinent part, Appellant's counsel objected as follows:

Appellant's Counsel: Sergeant Gretsky went up and he gave testimony that he interviewed my client and then he basically said he had nothing to say. He told me "I have nothing to say to you."

\* \* \*

[Appellant] has a right to remain silent. He doesn't have to say anything to the police . . . that testimony should not be presented.

N.T., 5/7/09, at 254–258.

The trial court, however, overruled Appellant's objection and the Commonwealth proceeded with the presentation of its case.

Subsequently, during closing arguments, Appellant's counsel referenced Appellant's pre-arrest refusal to speak with Sergeant Gretsky about the crime. Specifically, Appellant's counsel presented to the jury a variety of reasons justifying Appellant's decision not to speak with the sergeant. *See* N.T., 5/8/09, at 37–39. Thereafter, the Commonwealth in turn presented its closing arguments to the jury, during which the Commonwealth made the following references to Appellant's pre-arrest refusal to speak with Sergeant Gretsky:

Assistant District Attorney: But [Appellant] takes the odd step. He wants to—police say hey, look, you've been implicated in a murder. You want to talk to us? He doesn't remain silent. He chooses to talk. And he doesn't say you are out of your mind. I was at this party. It was a month later. I'm at this party. I was having a great time all day. I remember it was at Big Tome's house. He didn't say that. He says I don't have anything to say to you. He chooses not to speak and he chose to say that. He didn't choose to say, whoa, I got an alibi. No prison for me. You're not catching me on a murder rap. He says I have nothing to say to you.

N.T., 5/8/09, at 112–113. Appellant's counsel did not object to the Commonwealth's closing statements.

On appeal before this Court, Appellant argues that Sergeant Gretsky's testimony, together with the Commonwealth's closing

arguments, violated Appellant's right to silence pursuant to Article 1 § 9 of the Pennsylvania Constitution and the Fifth Amendment of the Constitution of the United States. For the reasons explained below, we hold that Appellant's constitutional rights have not been violated and affirm the determination of the trial court.

### (a) *Analysis of Applicable Law*

Both the Fifth Amendment of the United States Constitution and Article 1, Section 9 of the Pennsylvania Constitution protect an individual's right not to be compelled to be a witness against himself. *Commonwealth v. Lettau,* 604 Pa. 437, 986 A.2d 114, 117 (2009). Recently, in *Commonwealth v. Molina,* 33 A.3d 51 (Pa.Super.2011) (*en banc*) this Court addressed the identical issue raised by Appellant in the present case, i.e., whether reference to a non-testifying defendant's pre-arrest silence is constitutionally permissible. Because our disposition in *Molina* guides our resolution of the present case, a discussion of *Molina* is warranted.[2]

In *Molina,* Detective Hawthorne–Bey of the Pittsburgh Police Department testified at trial that she received information that a missing woman was being held against her will in Molina's house. The detective left a message with an individual named Pam Deloe, asking that Molina call the detective, and leaving Deloe her phone number. Later that same day, Molina called Detective Hawthorne–Bey, who questioned Molina about the missing woman. Molina informed the detective that he did not know where the woman was, but that he had heard that it was "out on the street" that he was involved in her disappearance. Molina stated that the rumor was not true. The detective asked Molina

when he last saw the woman, and Molina gave conflicting responses. Detective Hawthorne–Bey testified at trial that when she asked Molina to come down to police headquarters so that she could further interview him, Molina refused. Molina's counsel did not object to the introduction of this testimony.

Thereafter, during closing arguments, the Commonwealth commented on Molina's refusal to cooperate with Detective Hawthorne–Bey, and asked "why?" Molina's counsel objected. The trial court overruled the objection and refused counsel's request for a curative instruction. The Commonwealth resumed its closing argument and suggested that the jury "factor [Molina's pre-arrest silence] in when you're making an important decision in this case." *Molina* at 54. Molina appealed the trial court's admission, over his objection, to the Commonwealth's reference to his pre-arrest silence as substantive evidence of guilt. Addressing Molina's claim, we explained:

> The Fifth Amendment protects a defendant's decision not to testify at trial from prosecutorial comment. *See Griffin v. California,* 380 U.S. 609, 613–614 [85 S.Ct. 1229, 14 L.Ed.2d 106] (1965) (describing a state constitutional provision permitting comment on a defendant's silence at trial as a violation of the Fifth Amendment protection against self-incrimination); *Commonwealth v. Randall,* 758 A.2d 669 (Pa.Super.2000) ("It is axiomatic that a prosecutor may not comment adversely on a defendant's refusal to testify with respect to the charges against him since such commentary would compromise the defendant's privilege against self-incrimination and the defendant's constitutional presump-

---

**2.** Although I joined the dissent in *Molina* because I did not find that the Commonwealth's references to the pre-arrest silence were con-

stitutionally impermissible, I am constrained to follow the reasoning of the majority in *Molina* in deciding this case.

tion of innocence.") ... Thus, a criminal defendant has the absolute right to remain silent and to not present evidence.

Similarly, due process guaranteed by the Fourteenth Amendment protects post-*Miranda* silence for impeachment purposes....

In the seminal case of *Doyle v. Ohio*, 426 U.S. 610, 618 [96 S.Ct. 2240, 49 L.Ed.2d 91] (1976) the U.S. Supreme Court determined that prosecutorial comment at trial on a defendant's post-*Miranda* silence may violate due process, and that the prosecution generally may not impeach a testifying defendant with the fact of his post-*Miranda* silence. *Commonwealth v. Spotz* [582 Pa. 207], 870 A.2d 822 (2005).

\* \* \*

The law regarding post-arrest, pre-*Miranda* silence is less clear. In *Fletcher v. Weir*, 455 U.S. 603 [102 S.Ct. 1309, 71 L.Ed.2d 490] (1982) the Court held that when a defendant has been arrested but not yet *Mirandized* and later takes the stand in his own defense, the Fifth Amendment is not violated when the government cross-examines him concerning his post-arrest silence. However, the United States Supreme Court has not yet addressed whether post-arrest, pre-*Miranda* silence may be used as substantive evidence of guilt in the state's case.

However, in *Commonwealth v. Turner* [499 Pa. 579], 454 A.2d 537 (1992), the Pennsylvania Supreme Court explicitly acknowledged a more restrictive position than that taken by the United States Supreme Court in *Fletcher*. The *Turner* court held that a defendant cannot be impeached by the use of the inconsistency between his silence at the time of arrest, but before *Miranda* warnings are provided. *Id.* at 539. The

court established that in Pennsylvania the right to remain silent does not come into existence only when a subject is induced to remain silent by a *Miranda* warning. "We do not think that the accused should be protected only where there is a government inducement of the exercise of the right [to remain silent]." *Id.* at 540.

\* \* \*

The majority in *Turner* did not address the United States Supreme Court case of *Jenkins v. Anderson*, 447 U.S. 231 [100 S.Ct. 2124, 65 L.Ed.2d 86] (1980) which held that reference to a defendant's pre-arrest silence does not violate due process when used to impeach the credibility of a testifying defendant.

\* \* \*

[In *Commonwealth v. Bolus* [545 Pa. 103], 680 A.2d 839, 843 (Pa.1996) ] our Supreme Court was "called upon for the first time to decide whether a prosecutor may refer to a criminal defendant's pre-arrest silence." ... [T]he *Bolus* court relied on *Jenkins*, 447 U.S. at 238–240 [100 S.Ct. 2124], where the Court held for the first time that if a defendant testified, his pre-arrest silence can be used to impeach him.

\* \* \*

[Thereafter, in *Commonwealth v. DiNicola* [581 Pa. 550], 866 A.2d 329, 337 (2005) our Supreme Court] noted that it had previously implicitly "rejected a conclusion that impeachment is the sole permissible purpose for which a defendant's pre-arrest silence may be referenced by the Commonwealth in a criminal trial," and concluded that, subject to an assessment of probative value versus prejudicial effect, evidence of pre-arrest silence might be elicited for

the purpose of fair response to defense arguments.

\* \* \*

[T]he use of pre-arrest silence which occurred in response to a request by law enforcement, as substantive evidence of guilt ... has not been addressed by the United States Supreme Court or the Pennsylvania Supreme Court and federal circuits and state appellate courts are divided on the question. Although the United States Supreme Court has consistently held that the prosecution may elicit evidence of a defendant's pre-*Miranda* silence to impeach a defendant's inconsistent testimony during cross-examination, it has left virtually untouched the issue of whether a defendant's pre-*Miranda* silence may be used during the prosecution's case in chief during opening and closing arguments and direct examination of witnesses.

*Molina*, 33 A.3d at 54–55 (footnotes omitted).[3]

Thus, in *Molina*, this Court addressed for the first time in this Commonwealth, whether reference to a non-testifying defendant's pre-arrest silence is constitutionally permissible as substantive evidence of guilt. Following an analysis of applicable precedent from this and other jurisdictions, the panel majority in *Molina* held that "the Commonwealth cannot use a non-testifying defendant's pre-arrest silence to support its contention that the defendant is guilty of the crime charged as such use infringes on a defendant's right to be free from self-incrimination." *Molina* at 62. Therefore, pursuant to *Molina*, a non-testifying defendant's pre-arrest silence is deemed constitutionally protected, such that the government may not use such silence as substantive evidence of the defendant's guilt. *Id.* at 56–57.

**(b) *Application of the law to the case at bar***

Applying *Molina* to the present case, we conclude that *Molina* is distinguishable and conclude that under the particular facts of this case, Appellant's constitutional rights were not violated.

*Molina* makes clear that "the Commonwealth cannot use a non-testifying defendant's pre-arrest silence to support its contention that the defendant is guilty of the crime charged as such use infringes on a defendant's right to be free from self-incrimination." *Molina*, at 56–57 ("the government may not use [a defendant's pre-arrest] silence as substantive evidence of guilt when a defendant chooses not to testify, and such use should not be limited to persons in custody or charged with a crime; rather, it may also not be used against a defendant who remained silent during the investigation of a crime"). *Id.*

Importantly, however, the *Molina* court clarified that its holding "does not impose a *prima facie* bar against *any* mention of a defendant's silence" but rather "guard[s] against the exploitation of [a defendant's] right to remain silent by the prosecution." *Molina* at 63 (emphasis added). Specifically, *Molina* stated that "the mere revelation of a defendant's pre-arrest silence does not establish innate prejudice [where] it was not used in any fashion that was likely to burden defendant's Fifth Amendment right or to create inference of admission of guilt." *Molina* at 56, *citing Commonwealth v. DiNicola*, 581 Pa. 550, 866 A.2d 329, 337 (2005).

In *Molina*, when Detective Hawthorne–Bey testified that Molina refused to coop-

---

3. For a more comprehensive discussion of applicable U.S. Supreme Court and Pennsyl- vania jurisprudence, which we will not reproduce here, *see Molina*, at 54–58.

erate with her investigation, this Court held that the detective's testimony was "offered to denote the extent and focus of the police investigation with regard to [the victim's] disappearance." *Molina* at 56. Because the detective's testimony was offered for one narrow purpose, namely to demonstrate the extent and focus of the investigation, and because the revelation of Molina's silence was limited to its context, we indicated in *Molina* that the mere revelation of Molina's silence did not establish innate prejudice, nor was it used in a fashion likely to burden Molina's Fifth Amendment right or create an inference of admission of guilt. *Molina,* at 53–54. Rather, we held that the constitutional violation only arose when the Commonwealth, during closing argument, used the detective's testimony for a different purpose, i.e., as evidence of Molina's guilt. *Molina* at 53–54, 57.

■ In the present case, as in *Molina,* we conclude that Sergeant Gretsky's original testimony at trial regarding Appellant's refusal to cooperate with the investigation, was offered for a narrow purpose, namely to demonstrate the nature and focus of the investigation, and as foundational evidence demonstrating how the police came to obtain Appellant's DNA sample, which was later admitted into evidence at trial. *See* Trial Court Opinion, 12/8/10, at 8. Sergeant Gretsky's statements were limited in context, and neither Sergeant Gretsky nor the Commonwealth implied that Appellant's silence constituted a tacit admission of guilt. As such, the trial court did not err in admitting Sergeant Gretsky's statements over Appellant's objection. *See DiNicola,* 866 A.2d at 337 (the mere revelation of silence does not establish innate prejudice); *Commonwealth v. Whitney,* 550 Pa. 618, 708 A.2d 471, 478

(1998) ("[e]ven an explicit reference to silence is not reversible error where it occurs in a context not likely to suggest to the jury that silence is the equivalent of a tacit admission of guilt"). Thus, Appellant's constitutional rights were not violated when Sergeant Gretsky testified.

Subsequently, during closing arguments, both Appellant's counsel and then the Commonwealth made separate references to Appellant's pre-arrest refusal to speak with Sergeant Gretsky. We do not find that the Commonwealth's closing statements constituted a violation of Appellant's constitutional right to silence.

■ Preliminarily, we note that Appellant's counsel did not object to the Commonwealth's closing references to Appellant's refusal to cooperate with Sergeant Gretsky.[4] It is well settled that "a defendant's failure to object to allegedly improper testimony at the appropriate stage ... constitutes waiver." *Molina* at 55, *citing Commonwealth v. Redel,* 335 Pa.Super. 354, 484 A.2d 171, 175 (Pa.Super.1984). Here, although Appellant initially objected when Sergeant Gretsky revealed that Appellant had refused to cooperate with the investigation, Appellant failed to renew that objection when the Commonwealth remarked on Appellant's silence in its closing arguments. As such, Appellant has arguably waived his challenge on appeal to the Commonwealth's closing remarks, for having failed to object to those remarks at the proper stage. *See also Commonwealth v. Baumhammers,* 599 Pa. 1, 960 A.2d 59, 73 (2008) ("it is axiomatic that issues are preserved when objections are made timely to the error or offense"); *Commonwealth v. Powell,* 598 Pa. 224, 956 A.2d 406, 423 (2008) (absence of a contemporaneous objection below constituted a

---

4. *Compare with Molina,* where defense counsel promptly objected to the Commonwealth's

closing statements referencing the defendant's silence. *Molina* at 54.

waiver of appellant's claim respecting the prosecutor's closing argument); Pa.R.A.P., Rule 302(a).

■ Even in the absence of waiver, Appellant's claim that the Commonwealth's closing statements were constitutionally impermissible fails. In *Molina*, the only references to the defendant's pre-arrest silence were made by the Commonwealth who, on its own initiative, invited the jury to draw an adverse inference from the defendant's silence. Here, however, during Appellant's closing arguments, which preceded those of the Commonwealth, Appellant himself remarked upon his own silence as follows:

> Appellant's Counsel: Sergeant Gretsky testified. And one of the things he brought out was he interviewed [Appellant]. And he said listen, Shataan, I'm getting some story here you're involved with this home invasion. And [Appellant] had the gall to say I have nothing to say. And yet the Commonwealth is trying to implicate my client because he told him I have nothing to say. Well, isn't that the code there. You don't talk. You don't say anything. That's what everybody does. They don't like talking to the police for a reason. Or could it be that [Appellant] was thinking, well, I have a right not to say anything. I don't have to say a word to you period. Or was he thinking well I'm talking to a police officer. Everybody in my neighborhood's going to think I'm a snitch, I'm going to rat somebody out, whoever was involved in the home invasion, is that what he's thinking. Or maybe he was just thinking— maybe [Appellant] was just thinking, you know what, I don't know anything. I was at the party for Big Tome. I was there the whole night. I don't know anything about this. I

> don't want to get involved. But one thing that [Sergeant] Gretsky said was—the follow up was well, can you give me a DNA sample. Well, how about your fingerprints and palm prints? Okay. Sure. [Appellant] signed off on the consent forms and gave him the samples. Does that sound like a guilty person? He gave it to him right then and there. There [were] no problems with that. Okay. Here. Here's a consent. I'll go. He did the Buccal Swab and he went into the police station, got his fingerprints taken. He did it all. He cooperated. He just didn't want to give a statement about who was there. That's all. He didn't want to be a snitch. He didn't want to get involved.

N.T., 5/8/09, at 37–39.

Thus, here, unlike *Molina*, rather than preserving his right to silence, by remaining silent and continuing to object to any reference by the Commonwealth to that silence, Appellant's counsel made a tactical decision to comment on Appellant's pre-arrest silence during closing argument. In opting to comment about his silence, we conclude that Appellant "opened the door" to the Commonwealth making responsive closing remarks about Appellant's silence.

In *DiNicola*, our Supreme Court explained that where defense counsel "opens the door" to commentary on the defendant's pre-arrest silence, "there is no Fifth Amendment proscription precluding the raising of [that] silence in fair response to defense argumentation." *DiNicola*, 866 A.2d at 335 *citing United States v. Robinson*, 485 U.S. 25, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988). Here, after Sergeant Gretsky made his initial, admissible comments about Appellant's pre-arrest refusal to speak with him, Appellant's counsel pursued a strategy of suggesting to the jury, during his closing arguments, possible jus-

tifications for Appellant's pre-arrest silence. In so doing, Appellant "opened the door" to the Commonwealth's closing commentary in fair response to Appellant's line of argument that his pre-arrest silence was justified. *See Commonwealth v. Chmiel,* 30 A.3d 1111 (Pa.2011) ("even an otherwise improper comment may be appropriate if it is in fair response to defense counsel's remarks").

Appellant argues that he was forced to comment on his silence during closing, because of Sergeant Gretsky's earlier testimony, which introduced Appellant's pre-arrest silence to the jury. As such, Appellant argues that he was "left without a choice but to attempt to diffuse the inference that silence equals an admission of guilt." Appellant's Brief at 20–22. We disagree.

■ First, as previously explained, Sergeant Gretsky's comments, standing alone, were not innately prejudicial in violation of Appellant's constitutional rights, as they did not occur in a context likely to suggest to the jury that his silence was the equivalent of a tacit admission of guilt. *See DiNicola,* 866 A.2d at 336–337. Nor do we agree that Appellant was "left with no choice" but to attempt to justify his pre-arrest silence to the jury. Rather, Appellant had the option of maintaining his right to silence by refraining ·from commenting upon it, and preserving his objection to any further commentary upon his silence by the Commonwealth. In opting to speak about his silence and attempting to justify his silence to the jury, Appellant relinquished that right. By asking the jury to consider the reasons for his silence, Appellant countenanced the subsequent commentary by the Commonwealth about the reasons for Appellant's silence. As such, we conclude that the Commonwealth's closing remarks about Appellant's silence constituted a fair response and did not violate Appellant's right to silence. *See also U.S. v. Robinson,* 485 U.S. 25, 32, 108 S.Ct. 864, 869, 99 L.Ed.2d 23 (1988) *cited with approval in DiNicola, supra* (where the prosecutor's reference to the defendant's silence is a fair response to a claim made by a defendant or his counsel, there is no violation of the Fifth Amendment privilege).[5]

■ Finally, we conclude that even if impermissible, any error resulting from the Commonwealth's references to Appellant's silence was harmless. In *Commonwealth v. Spotz,* 582 Pa. 207, 870 A.2d 822, 834 (2005), the Pennsylvania Supreme Court made clear that "improper references to *post-arrest* silence are subject to harmless error analysis in the direct appeal context, where an objection to the

---

**5.** To the extent that we must address whether the Commonwealth's responsive comments at closing constituted prejudicial error, we reiterate that this issue has been waived because Appellant failed to object to the Commonwealth's closing statements. *See DiNicola,* 866 A.2d at 337 (for purposes of fair response, admissibility is presently subject primarily to the trial court's assessment of probative value versus prejudicial effect on appropriate objection, as is the case with all other evidence adduced at trial.); *Commonwealth v. Harris,* 884 A.2d 920 (Pa.Super.2005); *Commonwealth v. Fletcher,* 580 Pa. 403, 861 A.2d 898, 916 (2004) ("[c]omments by a prosecutor do not constitute reversible error unless the un-avoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so they could not weigh the evidence objectively and render a true verdict; when considering [an a]ppellant's claims of prosecutorial misconduct, it must be noted [that] a prosecutor's comments do not constitute evidence."). Because Appellant never objected to the Commonwealth's closing remarks, any claim of prejudice as a result of those remarks has not been preserved for appellate review. *Commonwealth v. Rivera,* 603 Pa. 340, 983 A.2d 1211, 1229 (2009) (lack of a contemporaneous objection constitutes a waiver of any challenge to the prosecutor's closing remarks).

reference has been preserved." In *Molina*, addressing a defendant's right to *pre-arrest* silence, this Court, while holding that such pre-arrest silence was constitutionally protected, nevertheless acknowledged that the prosecution's references to pre-arrest silence are also subject to a harmless error analysis. *Molina* at 58–60. As we explained in *Molina*, in conducting a harmless error analysis, we are guided by the following principles:

> [A]n error will be deemed harmless where the appellate court is convinced beyond a reasonable doubt that the error could not have contributed to the verdict. Guidelines for determining whether an error is harmless include: (1) whether the error was prejudicial to the defendant or if prejudicial, whether the prejudice was *de minimis*; (2) whether the erroneously admitted evidence was merely cumulative of other, untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) whether the evidence of guilt was so overwhelming as established by properly admitted and uncontradicted evidence that the prejudicial effect of the error was so insignificant by comparison to the verdict.

*Commonwealth v. Nolen*, 535 Pa. 77, 634 A.2d 192, 196 (1993), *citing Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155, 164–165 (1978) (footnote omitted). *See also Molina* at 58. "The Commonwealth has the burden of proving harmless error beyond a reasonable doubt." *Commonwealth v. Wright*, 599 Pa. 270, 961 A.2d 119, 143 (2008).

In *Molina*, we concluded that the Commonwealth's reference to the defendant's silence was *not* harmless. *Molina* at 58–60. In so doing, we explained that the Commonwealth's evidence against the defendant was not overwhelming. Thus, the Commonwealth's reference to the defendant's silence may have improperly contributed to the jury verdict. In reaching that determination, we noted in *Molina* that the Commonwealth had relied almost exclusively on the testimony of a witness whose credibility was sharply disputed. We concluded that reasonable jurors could have differed in their assessment of that witness's credibility, such that her testimony could not be relied upon as so overwhelming that the reference to the defendant's silence could not have affected the jury's verdict. *Id.*

Here, unlike *Molina*, the Commonwealth presented ample evidence from various sources that Appellant was at the scene of the shooting and participated in the commission of the crime. M.B., the victim's wife, presented uncontradicted testimony that during the invasion of her home, she immediately recognized Appellant as one of the perpetrators, because he lived across the street from her and she had seen him in the neighborhood on a daily basis. N.T., 5/5/09, at 87, 90–91, 92, 118–119, 136–137. In addition, Mr. Redfain testified at trial that he, Appellant, and Mr. Hammond had together planned and participated in the commission of the crime. Mr. Redfain further corroborated in detail M.B.'s testimony regarding the manner in which the crime occurred. N.T., 5/6/09, at 197–350. Additionally, Dyeisha Wallace testified that on more than one occasion prior to the commission of the crime, she overheard Mr. Hammond and Mr. Redfain articulate an intention to rob the victims. N.T., 5/7/09, at 48–50. Ms. Wallace further testified that on the night of the crime, shortly before the home invasion occurred, she saw Mr. Redfain, Mr. Hammond and Appellant together and heard Mr. Redfain ask Mr. Hammond and Appellant "are you ready", and then ask Appellant whether he was "in this with us." N.T., 5/7/09, at 69.

The eyewitness testimony of M.B., who positively identified Appellant as a perpetrator, along with the testimony of Ms. Wallace, and the corroborating testimony of Mr. Redfain, provided overwhelming evidence and thus rendered harmless the Commonwealth's reference to defendant's silence. *See Commonwealth v. Wright,* 599 Pa. 270, 961 A.2d 119 (2008) (in light of the overwhelming evidence implicating the defendant in the crime, the prosecution's remarks about the defendant's silence constituted harmless error); *Commonwealth v. Moury,* 992 A.2d 162 (Pa.Super.2010) (properly admitted evidence of defendant's guilt was so overwhelming that the single reference to his silence constituted harmless error); *Commonwealth v. Mitchell,* 576 Pa. 258, 839 A.2d 202, 215 n. 2 (2003) (there is no impediment to considering . . . uncontradicted circumstantial evidence when conducting a harmless error analysis and an improper prosecutorial reference to the defendant's silence may be harmless given uncontradicted evidence of guilt).

For the foregoing reasons, we affirm the determination of the trial court that Appellant's constitutional right to silence was not violated in the present case.

### 2. *Sufficiency of the Evidence*

In his second issue, Appellant challenges the sufficiency of the evidence with regard to his conviction for aggravated indecent assault. Appellant's conviction for aggravated indecent assault is based upon the actions of Mr. Redfain, who digitally penetrated M.B.'s vagina during the course of the home invasion. Appellant claims that the evidence is insufficient to support his conviction either under the theory of accomplice liability, or as a co-conspirator. Specifically, Appellant contends there was no evidence presented at trial that he conspired with Redfain and Hammond to sexually assault M.B., or that he aided, pro-

moted or participated in the sexual assault. Appellant's Brief at 22–27.

Our standard of review when considering a challenge to the sufficiency of the evidence is as follows:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Brown,* 23 A.3d 544, 559–560 (Pa.Super.2011) (*en banc*) (citations omitted).

In the present case, the trial court determined that the Commonwealth presented sufficient evidence to find Appellant guilty of aggravated indecent assault, under a theory of accomplice liability. We agree.

18 Pa.C.S.A. § 3125(a)(1), governing the elements of aggravated indecent assault, provides in pertinent part as follows:

> (a) Offenses defined.—... [A] person who engages in penetration, however slight, of the genitals or anus of a complainant with a part of the person's body for any purpose other than good faith medical, hygienic or law enforcement procedures commits aggravated indecent assault if:
>
> > (1) the person does so without the complainant's consent....

18 Pa.C.S.A. § 3125(a)(1).

The trial court in this case concluded that the evidence was sufficient to find Appellant guilty of aggravated indecent assault as an accomplice, pursuant to 18 Pa.C.S.A. § 306, which provides:

> **§ 306. Liability for conduct of another; complicity**
>
> **(a) General rule.**—A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both.
>
> > \* \* \*
>
> **(c) Accomplice defined.**—A person is an accomplice of another person in the commission of an offense if:
>
> > (1) with the intent of promoting or facilitating the commission of the offense, he:
> >
> > > (i) solicits such other person to commit it; or
> > >
> > > (ii) aids or agrees or attempts to aid such other person in planning or committing it; or
> >
> > (2) his conduct is expressly declared by law to establish his complicity.

18 Pa.C.S.A. § 306.

■■■ "[T]wo prongs must be satisfied for a person to be labeled an 'accomplice.' First, there must be evidence that the person intended to aid or promote the underlying offense. Second, there must be evidence that the person actively participated in the crime by soliciting, aiding, or agreeing to aid the principal. Further, a person cannot be an accomplice simply based on evidence that he knew about the crime or was present at the crime scene. There must be some additional evidence that the person intended to aid in the commission of the underlying crime, and then aided or attempted to aid." *Commonwealth v. Rega*, 593 Pa. 659, 933 A.2d 997, 1015 (2007) (citations omitted). For purposes of accomplice liability, "[n]o agreement is required, only aid." *Commonwealth v. Kimbrough*, 872 A.2d 1244, 1251 (Pa.Super.2005). "With regard to the amount of aid, it need not be substantial so long as it was offered to the principal to assist him in committing or attempting to commit the crime." *Commonwealth v. Murphy*, 577 Pa. 275, 844 A.2d 1228, 1234 (2004). "[T]he least degree of assistance in committing the offense is adequate to sustain the finding of responsibility as an accomplice." *Commonwealth v. Gladden*, 445 Pa.Super. 434, 665 A.2d 1201, 1209 (1995).

■■■ Here, the trial court, determining that the evidence was sufficient to support Appellant's conviction as an accomplice, explained:

> In his testimony, Redfain admitted to digitally penetrating [M.B.]. He did so ruthlessly and against her will. The aggravated indecent assault occurred in [M.B.]'s kitchen. The facts firmly establish that it was [Appellant's] conscious object or desire for Redfain to commit the assault. [M.B.] testified that the assault occurred once all three felons had returned to the kitchen area. [Appellant] was armed and persistently stood over [M.B.] with his firearm pointed at her; this occurred while Ham-

mond physically hit her, and Redfain assaulted her. The aforementioned conduct clearly demonstrates [Appellant's] role in aiding Redfain ... specifically to commit the aggravated indecent assault. [Appellant's] actions undoubtedly made Redfain's task easier and more probable. Trial Court Opinion, at 12/8/10, at 10.

Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, we agree with the trial court that the evidence was sufficient evidence to support Appellant's conviction for aggravated indecent assault. Mr. Redfain admitted at trial that he digitally penetrated M.B. during the course of the home invasion. N.T., 5/6/09, at 321. M.B. testified at trial that Appellant was present in the kitchen and stated that Appellant was wielding a handgun at the time Mr. Redfain sexually assaulted her. N.T., 5/5/09, at 86–96, 134–135. M.B. further testified that Mr. Redfain "guided and directed" Appellant and Mr. Hammond to "do whatever it is he wanted to have done," and further stated that at the time of the sexual assault, Appellant suggested to his companions that they "tie that bitch up," referring to M.B. *Id.* at 90–91. [M.B. additionally testified that following the sexual assault, Appellant alerted Mr. Redfain and Mr. Hammond that the victim had returned to the residence. *Id.* at 96. In light of the foregoing, we agree with the trial court that the evidence was sufficient to support Appellant's conviction for aggravated indecent assault under a theory of accomplice liability.

### 3. *Legality of the Sentence*

 In his third issue, Appellant claims that the trial court imposed an illegal sentence. Specifically, Appellant asserts that the trial court erred in imposing a sentence for second-degree murder, and a separate sentence for burglary. Appellant avers that the two crimes merged for sentencing purposes, and that the separate sentence imposed for the crime of burglary is therefore illegal. The trial court, in its 1925(a) opinion, concedes that the imposition of a separate sentence for the crime of burglary was in error, and requests that this Court vacate the judgment of sentence solely on that basis, and remand for resentencing. We agree with Appellant and the trial court that the separate sentence for burglary was in error. *See Commonwealth v. Maddox*, 307 Pa.Super. 524, 453 A.2d 1010, 1015 (1982) (citations omitted) (The doctrine of merger applies when one crime "necessarily involves" another, that is, if the essential elements of both crimes are the same and no additional facts are needed to prove the additional offense, the additional offense merges into the primary offense for sentencing purposes and only one sentence may thereafter be imposed); *Commonwealth v. Harper*, 512 Pa. 155, 516 A.2d 319, 321 (1986) ("for double jeopardy purposes, the underlying felony in a felony-murder prosecution is the "same offense" as the murder; therefore, sentences for both the murder and the underlying felony are prohibited"). In the present case, burglary was the underlying felony for Appellant's conviction of second-degree murder. The crime of burglary therefore merges with that of second-degree murder for sentencing purposes, such that we vacate the judgment of sentence and remand for resentencing solely on that basis.

Judgment of sentence vacated.