J-S28010-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRIAN KEITH MCCULLOUGH | : | |
| | : | |
| Appellant | : | No. 32 MDA 2025 |

Appeal from the Judgment of Sentence Entered December 18, 2024
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0000929-2022

BEFORE:  BOWES, J., OLSON, J., and KING, J.

MEMORANDUM BY BOWES, J.:                    **FILED DECEMBER 15, 2025**

Brian Keith McCullough appeals from the sentence of life in prison following his convictions of, *inter alia*, first-degree murder.  We affirm.

The victim in this matter was Erika King, Appellant's paramour of several years as of the time of the killing.  On December 28, 2021, Ms. King and her then sixteen-year-old daughter, L.R., ran several errands with Appellant, including purchasing donuts and going to the pet store.  L.R. was displeased that Appellant was accompanying them because she considered the relationship between Ms. King and Appellant to be "toxic."  N.T. Trial, 10/28-31/24, at 75.  To that end, L.R. had witnessed arguments between the couple and seen Ms. King with injuries that she believed were caused by Appellant.  *Id*.  Appellant did not live with Ms. King, though he would visit frequently.

At some point during the drive, Ms. King and Appellant got into a heated quarrel over a joke the former made about cooking dinner for someone, which

Appellant interpreted as referring to another man. The group arrived back at Ms. King's duplex in Harrisburg, and L.R. went into the house to begin cooking dinner while Ms. King and Appellant remained in the car. Ms. King eventually came into the house and ate dinner with L.R., while Appellant continued sitting in the passenger seat of Ms. King's vehicle. Afterward, Ms. King and L.R. went to their respective rooms to prepare to go to sleep. Immediately before lying down, L.R. observed from a window that Appellant was still inside the vehicle.

A brief time later, from her room, L.R. heard Appellant come into the house and proceed into Ms. King's bedroom, which was down the hall. She recognized Appellant's voice and overheard parts of a subsequent argument between Appellant and Ms. King. Ms. King then began screaming L.R.'s name to call someone for help because "he had a gun." *Id*. at 82. Without leaving her room, L.R. called her godmother and then 911. She locked her door and remained inside while on the line with the dispatcher. L.R. heard Ms. King say "Brian, stop pointing the gun at me," with Appellant responding that he "didn't care." *Id*. at 83. Multiple gun shots subsequently rang out while L.R. was on the phone.

Law enforcement responded to the scene less than five minutes from the onset of the 911 call. Dispatch described the situation to officers as a domestic incident involving a shooting. Upon arrival, an officer encountered Appellant lying in the grass outside the front of the duplex. Appellant informed the officer that he had been shot, which was quickly determined to be false.

Appellant also had a functioning cellular phone with him, and it is undisputed that he never attempted to call for emergency services.

Officers made entry into the home, where they safely retrieved L.R. and found Ms. King deceased in her bedroom. A nine-millimeter handgun was located on the floor of the living room approximately five steps from the front door. Appellant was arrested at the scene, and he gave a recorded statement to police later that night wherein he posed "bizarre" questions, asking if he was being "punked" or if he was dead. *Id*. at 363. Contrary to his claim of being shot, the only injury to Appellant was a left patellar tendon tear, which compromised the integrity of the tendons binding his left knee bone. *Id*. at 324.

After the execution of search warrants, detectives located seven shell casings and one spent projectile from Ms. King's bedroom. An autopsy confirmed that she had been shot five times, every one of which was deemed a fatal wound. Based on the stippling of soot left on Ms. King's skin, the medical examiner determined that several of the discharges were from the distance of two to three feet. Ms. King also had both old and fresh bruises on various parts of her body.

Investigators swabbed the grip of the handgun and its magazine, and sent the samples to the Pennsylvania State Police ("PSP") for analysis. DNA testing as to the grip was deemed not "interpretable" pursuant to PSP's guidebook for testing. *Id*. at 427-28. However, the swab taken from the

magazine was consistent with the presence of a DNA mixture, with contributions from both Appellant and Ms. King.

The Commonwealth charged Appellant with murder and several offenses related to his possession of the firearm. The Commonwealth filed a motion *in limine* seeking, among other things, leave to present evidence of four previous uncharged instances of domestic abuse between Appellant and Ms. King. Appellant filed his own motion seeking to preclude the same and requesting pre-trial rulings as to evidentiary matters not relevant to this appeal. Following argument, the court granted the Commonwealth's motion insofar as it was allowed to introduce evidence of the prior incidents of domestic violence, subject to hearsay rules.

The case proceeded to a jury trial, which bore out the above facts. The attorneys stipulated that the handgun found in the residence was reported stolen approximately five years before, and that Appellant was not permitted by law to possess a firearm. L.R. attested that Appellant had brought the weapon into Ms. King's home before and left it there periodically.

Additionally, consistent with the court's evidentiary ruling, L.R. testified about four incidents of domestic abuse occurring prior to the shooting. These included three separate times where L.R. photographed various injuries on Ms. King. Specifically, L.R. took pictures of (1) bruises on Ms. King's arm three weeks before the shooting, (2) a black eye approximately two months prior to the incident, and (3) Ms. King leaving the hospital in an arm sling five months preceding the murder. All photographs were entered into evidence

over objection. L.R. also mentioned a fourth occurrence when she heard her younger brother yelling at Appellant to stop "hitting" Ms. King, though she could not recall when that happened and did not observe the interaction.[1]

Notably, L.R. additionally attested to several statements made by Ms. King related to these encounters, over the hearsay objection of Appellant. For example, she stated that she photographed the bruises on Ms. King's arms "[b]ecause my mom was scared and she didn't want anything to happen to her[,] so she told me to take pictures in case something bad [happened]." *Id*. at 92. She further recounted several times during trial that Ms. King had disclosed that she was afraid of Appellant while the pictures were being taken, and that "she was tired of being in the hospital." *Id*. at 93, 96, 100.

Appellant did not testify, but did call several witnesses on his behalf. First was a serology expert, who criticized the methodology of the DNA testing performed by PSP and the characterization of the reported results. Particularly, Appellant's expert contended that although PSP's guidebook deemed some of the DNA results to be not interpretable, his own analysis revealed that at least three people, including one additional male beyond Appellant, contributed to the DNA mixture taken from the magazine of the firearm. However, he nonetheless conceded that PSP's results were accurate insofar as they demonstrated that Appellant's DNA was, in fact, on the magazine.

---

[1] L.R.'s brother was not in the house the night of the murder.

Appellant furthermore called Ms. King's neighbor from the other half of the duplex, Destiny Harris, who stated that she did not know either Ms. King or Appellant very well. She expressed that she did not hear any arguments the night of the shooting, but did hear a loud "thump" that she thought was caused by L.R. or her younger brother. Ms. Harris also indicated that a few months before the shooting, she encountered Ms. King at the grocery store with a black eye, and exclaimed that Ms. King was "crazy" for staying in a relationship with Appellant. *Id*. at 526-27.

Appellant also called as a witness one of his prior paramours, who dated Appellant up until seven months prior to the shooting, despite Appellant also being in a relationship with Ms. King at that time. She expressed that she never suffered abuse from Appellant and did not believe he had a gun. Appellant's mother also testified that she never witnessed Ms. King being afraid of Appellant, bruising on Ms. King, or Appellant with a firearm. In general, Appellant's defense at trial was to suggest inadequate investigation by police and that another individual killed Ms. King, presumably as a result of drug dealing.[2]

---

[2] This was based upon the fact that investigators recovered over 100 grams of fentanyl from a bag located near Ms. King's body. On cross-examination, a detective that testified on behalf of the Commonwealth conceded that this amount alone was potentially high enough that his department would charge a person with possession with intent to distribute. However, we note that law enforcement did not find within the house any scales, packaging materials, owe lists, or other indicia of narcotics trafficking.

Following trial, the jury convicted Appellant of all offenses. The trial court later sentenced him to life in prison for murder and concurrent periods of incarceration for receiving stolen property and possession of a firearm prohibited. This timely appeal followed. The trial court ordered Appellant to submit a statement of errors pursuant to Pa.R.A.P. 1925(b),[3] and Appellant complied. The court thereafter authored a responsive Rule 1925(a) opinion.

Appellant presents the following issues for our consideration:

A.     In a trial involving the alleged killing of a former domestic partner, did the lower court err in admitting four prior instances of alleged domestic violence under Pa.R.E. 404(b) as more prejudicial than probative?

B.     Did the lower court err in admitting statements that the decedent was afraid of [Appellant] under the state of mind exception when the statement included more than simply a belief about fear, but specifically was targeted that she was afraid of [Appellant]?

C.     Even if admissible under the state of mind exception, did the court err in admitting this evidence as violative of [Appellant]'s right to confrontation?

Appellant's brief at 5 (cleaned up).

Since our resolution each of Appellant's claims is founded upon a common basis, we address them collectively. In the first, he contends that the trial court erred in permitting L.R. to testify concerning the injuries she

_____

[3] We remind the trial court that all Rule 1925(b) orders must provide, among other things, "the address to which the appellant can mail the Statement" and "that any issue not properly included in the Statement timely filed and served pursuant to subdivision (b) **shall** be deemed waived." Pa.R.A.P. 1925(b)(3)(iii-iv) (emphasis added).

observed on Ms. King, which she attributed to Appellant, and the corresponding photographs showing such. *Id*. at 14-20. He claims that this runs afoul of our evidentiary rules because the potential for unfair prejudice arising from this evidence outweighed its probative value. Next, Appellant maintains that L.R.'s references to several declarations of her mother constituted impermissible hearsay. These include statements wherein Ms. King expressed to L.R. her fear of Appellant, that she wanted pictures of her injuries taken in case something bad happened to her, and that she was tired of being in the hospital, presumably due to Appellant's actions. *Id*. at 20-25. Finally, Appellant argues that these same statements, even if excepted from the hearsay rules, were admitted in violation of Appellant's confrontation clause rights since he could not cross-examine Ms. King. *Id*. at 26-36.

We begin by noting that "[t]he admission of evidence is committed to the sound discretion of the trial court and our review is for an abuse of discretion." *Commonwealth v. Kane*, 188 A.3d 1217, 1229 (Pa.Super. 2018) (citation omitted). Additionally, "[w]hether a defendant was denied his right to confront a witness under the confrontation clause of the Sixth Amendment is a question of law for which our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Tejada*, 161 A.3d 313, 317 (Pa.Super. 2017) (cleaned up).

Appellant concedes in his brief that allegations of evidentiary error and confrontation clause violations are subject to the harmless error doctrine. *See*, *e.g.*, *Commonwealth v. Vance*, 316 A.3d 183, 192 (Pa.Super. 2024)

(applying harmless error to evidentiary errors); ***Commonwealth v. Levanduski***, 907 A.2d 3, 21 (Pa.Super. 2006) ( "Not all violations of the accused's right to confront his witnesses result in reversible error.  The appropriate standard for review under these circumstances is the harmless error test[.]").

The following law governs harmless error review:

> [A]n error will be deemed harmless where the appellate court is convinced beyond a reasonable doubt that the error could not have contributed to the verdict.  Guidelines for determining whether an error is harmless include:  (1) whether the error was prejudicial to the defendant or if prejudicial, whether the prejudice was *de minimis*; (2) whether the erroneously admitted evidence was merely cumulative of other, untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) whether the evidence of guilt was so overwhelming as established by properly admitted and uncontradicted evidence that the prejudicial effect of the error was so insignificant by comparison to the verdict.

***Commonwealth v. Adams***, 39 A.3d 310, 322 (Pa.Super. 2012) (cleaned up).

For the sake of this appeal, we assume that the court improperly allowed the Commonwealth to introduce evidence of prior incidents of domestic abuse, as well as L.R.'s testimony indicating that Ms. King expressed both her fear of Appellant and his responsibility for hitting her.  Thus, the inquiry becomes whether these purported errors were harmless.

On this topic, Appellant maintains that they were not because "the jury heard facts which were not permissible to hear, as well as violative of the constitution."  ***See*** Appellant's brief at 37.  Stated another way, Appellant

argues, in circular fashion, that the evidence was prejudicial because it should not have been admitted. He further contends that the evidence was not cumulative to other untainted evidence, since it was drastically different in nature from the testimony pertaining to the investigation of the shooting and the crime scene. *Id*. at 38-39. Finally, Appellant believes that the evidence of his guilt in this case was not overwhelming as no witness, including L.R., observed the shooting. *Id*. at 39. Thus, he argues this raised a reasonable doubt as to whether Appellant "pulled the trigger." *Id*.

For its part, the Commonwealth avers that "any hypothetical error [by the trial court] was *de minimis* and cumulative in light of the overwhelming evidence of Appellant's guilt," opining that Appellant was "caught red-handed" in this case. *See* Commonwealth's brief at 19. It notes that Appellant was the only person present during the shooting besides Ms. King and L.R., and that the number of deadly shots permitted the jury to infer specific intent to cause death. *Id*. at 19-20. The Commonwealth concludes:

> Appellant was arrested with injuries which place him at the scene and further establish motive. Appellant immediately lied to police and attempted to claim that it was the victim who shot him, but Appellant had no corroborating injuries or evidence to this effect. This statement, as well as Appellant's possession of a stolen firearm, demonstrate [his] consciousness of guilt.

*Id*. at 20.[4]

---

[4] The trial court did not address the harmless error doctrine in its Rule 1925(a) opinion.

- 10 -

Upon review, we agree with the Commonwealth that any error on the part of the trial court was harmless. Particularly, we determine that "the evidence of guilt was so overwhelming as established by properly admitted and uncontradicted evidence that [any] prejudicial effect of the error was so insignificant by comparison to the verdict." **Adams**, 39 A.3d at 322.

Putting aside the prior allegations of abuse, photographs of Ms. King's bruising, and statements of fear attributed to Ms. King, the evidence established that she and Appellant nevertheless were in a years-long "toxic" relationship that entailed frequent arguments. **See** N.T. Trial, 10/28-31/24, at 75. This included a heated debate on the day of the shooting wherein Appellant expressed his belief that Ms. King intended to cook dinner for another man, and he remained seated in Ms. King's car for a prolonged period while L.R. and Ms. King ate dinner and got ready for bed. There is no dispute that Appellant remained outside the house until moments before the shooting. L.R. then heard yet another argument coming from Ms. King's bedroom down the hall, hearing only the voices of her mother and Appellant. Unchallenged by Appellant was L.R.'s testimony that Ms. King exclaimed by name, imminently before the shooting, that Appellant was pointing a gun at her. **Id**. at 83. L.R. had also seen Appellant with the recovered firearm on multiple occasions.

Law enforcement found Appellant right outside the home within mere minutes of L.R.'s 911 call. He lied about being shot and never attempted to contact emergency services with his functioning cell phone. He was suffering

from a left patellar tendon tear, which offered a reasonable explanation for why he could not flee the scene before officers arrived. Furthermore, the magazine from the handgun retrieved from the house contained Appellant's DNA. Contrary to Appellant's defense at trial, there was no evidence of another person being in the residence during the time of the shooting, other than perhaps the weak inference that the stolen firearm possibly contained DNA from an additional male contributor besides Appellant. At best, Appellant **suggested** through his defense that there could have been some other person there, but was unable to point to any evidence demonstrating such.

It was also uncontested that Ms. King was found to have fresh and old bruises on her body during the autopsy. Appellant's own witness, Ms. Harris, confirmed that several months before the shooting, she witnessed Ms. King with a black eye and expressed disbelief with her intent to remain in a relationship with Appellant.[5] *Id*. at 526-27. Therefore, there was significant uncontroverted evidence that Ms. King was in an abusive relationship with Appellant apart from the challenged photographs and statements at issue.

Based on the above, The Commonwealth overwhelmingly proved that Appellant was present at the time of the shooting, and had both the means and motive to kill Ms. King. We are persuaded beyond a reasonable doubt that any erroneous admission of L.R.'s testimony concerning Ms. King's fear

_____

[5] In this regard, any improper testimony from L.R. as to her observations of bruises surrounding this particular incident would be cumulative of properly admitted, untainted evidence. *See Adams*, 39 A.3d at 322.

- 12 -

of Appellant and prior injuries was harmless insofar as any "prejudicial effect

. . . was so insignificant by comparison to the verdict." ***Adams***, 39 A.3d at

322. Thus, we have no cause to disturb Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/15/2025