J-S19010-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MUJAHID MUHAMMAD | |
| Appellant | No. 1300 EDA 2014 |

Appeal from the Judgments of Sentence entered July 19, 2012
In the Court of Common Pleas of Philadelphia County
Criminal Division at Nos: CP-51-CR-0006525-2010, CP-51-CR-0006526-2010

BEFORE:  STABILE, JENKINS, and MUSMANNO, JJ.

MEMORANDUM BY STABILE, J.:                    **FILED APRIL 20, 2015**

Appellant, Mujahid Muhammad,[1] appeals *nunc pro tunc* from the judgments of sentence entered for his convictions of two counts of aggravated assault as an accomplice.  Appellant challenges the sufficiency of the evidence and the trial court's denial of a mistrial based on statements made by the prosecutor during closing arguments.  Upon review, we affirm.

This case began over an argument about the rules of a pickup basketball game.[2]  At around 6:30 p.m. on March 2, 2010, Anthony Ellerbee,

---

[1] In the record, Appellant's surname is spelled "Muhammad" and "Muhammed."  At sentencing, Appellant spelled his own name "Muhammad." **See** N.T. Preliminary Hearing [sic], 7/19/12, at 3.  We direct correction of the caption accordingly.

[2] The factual background is taken from the trial court's Pa.R.A.P. 1925(a) opinion filed August 28, 2014, and the notes of testimony of trial.

his cousins Keith and Zsaron Simpson, and a friend arrived at World's Gym on Roosevelt Boulevard in Northeast Philadelphia to play basketball. Under the rules of the game, the teams counted all made field goals as one point. During the first game, Appellant, who was waiting to play, began to yell from the sideline that three-point field goals should count as two points, to speed up the pace of play. After the first game was over, Appellant and Zsaron Simpson got into a verbal altercation near center court. Ellerbee stepped in between the two to diffuse the situation. Appellant eventually walked off the court.

While playing the next game, Ellerbee noticed that Appellant was on a cellphone. Play continued for about 20 minutes until a foul stopped the action. During the break, Ellerbee and Keith Simpson noticed a man (the shooter) wearing jeans, boots, and a dark jacket. Everyone else in the gym was dressed to play basketball. The shooter and Appellant made eye contact and exchanged head nods, and the shooter walked up to Zsaron Simpson, passing by the other players and people waiting to play.

Appellant and Zsaron Simpson exchanged words, and the shooter pulled a handgun and struck Zsaron Simpson in the mouth with it. He pointed the gun at Keith Simpson, and then at Ellerbee, who raised his hands. While the shooter pointed the gun at Ellerbee's chest, Appellant ran over and tackled Zsaron Simpson to the floor. The armed man ran over to Appellant and Zsaron Simpson, and Ellerbee followed to assist Zsaron. Ellerbee pulled the shooter off Zsaron and forced the shooter onto the floor.

- 2 -

Once on the floor, Appellant punched Zsaron Simpson multiple times. The shooter fired a shot into Ellerbee's chest, and then a second that grazed Ellerbee's forehead and struck his ear. Zsaron Simpson moved away toward a bench at center court. The shooter followed and shot him once in the stomach. Then, the shooter and Appellant left the gym together. Ellerbee and Zsaron Simpson also left. Both were hospitalized for their injuries. Ellerbee spent two days in the hospital and needed two months of rehabilitation. Zsaron Simpson was hospitalized for about one month and required four surgeries.

Philadelphia Police officers on routine patrol apprehended Appellant later that evening. Appellant had blood on his shirt and a graze gunshot wound that required medical treatment.

Appellant was charged with two counts each of attempted murder, aggravated assault, conspiracy to commit murder or aggravated assault,[3] and other crimes not relevant here. Following trial, the jury convicted Appellant of both counts of aggravated assault, acquitted him of both counts of attempted murder, and deadlocked on both counts of criminal conspiracy. The trial court later sentenced Appellant to two consecutive terms of 10 to 20 years in prison. Appellant appealed to this Court, but we dismissed the appeal, No. 2292 EDA 2012, when Appellant's counsel failed to file a brief.

_____

[3] 18 Pa.C.S.A. §§ 901(a), 2702(a), and 903(a)(1).

- 3 -

Appellant filed a petition for post-conviction relief, and the Commonwealth agreed to reinstatement of Appellant's direct appeal rights. This appeal *nunc pro tunc* followed.

Appellant presents two issues for review:

1. Was insufficient evidence presented to sustain the verdicts because it did not provide the degree of certainty to support a beyond[-]a[-]reasonable[-]doubt finding as to Appellant's complicity as either a co-conspirator or accomplice, nor did it prove his intent to inflict or attempt to inflict serious bodily injury, and also because it was so contradictory as to render it incapable of reasonable reconciliation?

2. Does prosecutor[ial] misconduct in summation compel reversal?

Appellant's Brief at 7 (numbering altered and all-caps font removed).

Appellant first argues the evidence of aggravated assault is insufficient, which is a question of law. Accordingly, "our standard of review is *de novo,* however, our scope of review is limited to considering the evidence of record . . . ." ***Commonwealth v. Rushing***, 99 A.3d 416, 420-21 (Pa. 2014); ***see also Commonwealth v. Koch***, 39 A.3d 996, 1001 (Pa. Super. 2011) (noting that, "in conducting our analysis, we consider all of the evidence actually admitted at trial"), *aff'd by an equally divided court*, 106 A.3d 705 (Pa. 2014).

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.

***Koch***, 39 A.3d at 1001 (internal citations omitted).[4]

Appellant was convicted of aggravated assault under 18 Pa.C.S.A. § 2702(a)(1), under which "[a] person is guilty of aggravated assault if he . . . causes [serious bodily] injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." Serious bodily injury is "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." ***Id.*** § 2301. For a completed aggravated assault under § 2702(a)(1) where the victim actually suffers serious bodily injury, the Commonwealth "need only prove [the defendant] acted recklessly under circumstances manifesting an extreme indifference to the value of human life." ***Commonwealth v. Patrick***, 933 A.2d 1043, 1046 (Pa. Super. 2007) (*en banc*) (quoting ***Commonwealth v. Nichols***, 692 A.2d 181, 185 (Pa. Super. 1997)).

Additionally, because Appellant did not shoot Ellerbee or Zsaron Simpson, the Commonwealth was required to prove that he was legally responsible for the shooter's conduct. Appellant contends the

---

[4] We reject Appellant's argument that ***In re Winship***, 397 U.S. 358 (1970), established a constitutional "near certitude of guilt" standard for judging the sufficiency of the evidence. ***See*** Appellant's Brief at 13-14. Appellant's stitches together his contention from parts of two sentences from two separate paragraphs of ***Winship***, and he provides no authority from the last 45 years supporting his argument.

Commonwealth was required to prove that he **intended** to cause serious bodily injury to the victims.  We disagree for the following reasons.

"A person is legally accountable for the conduct of another person when . . . he is an accomplice of such other person in the commission of the offense."  18 Pa.C.S.A. § 306(b)(3).  Accomplice liability does not create a separate crime, but rather seeks to hold an accomplice equally liable for the conduct of the principal.  ***Commonwealth v. Gross***, 101 A.3d 28, 35 (Pa. 2014).  Unlike conspiracy, accomplice liability does not require proof of an agreement.[5]  ***Commonwealth v. Adams***, 39 A.3d 310, 324 (Pa. Super. 2012), *aff'd*, 104 A.3d 511 (Pa. 2014).  However, mere presence at the

_____

[5] The Commonwealth argues we may find the Appellant liable for aggravated assault as a reasonably foreseeable crime committed by Appellant's "co-conspirator."  Appellee's Brief at 11.  The Commonwealth, however, relies on authority that does not apply current Pennsylvania law, namely 18 Pa.C.S.A. § 306 (establishing liability for conduct of another), which is a nearly verbatim codification of Model Penal Code (MPC) § 2.06.  ***Commonwealth v. Thomas***, 189 A.2d 255 (Pa. 1963), predates the promulgation of the Crimes Code, and ***United States v. Lopez***, 271 F.3d 472 (3d Cir. 2001) (citing ***Pinkerton v. United States***, 328 U.S. 640 (1946)), applies federal common law, and not the MPC.  Indeed, the MPC rejects ***Pinkerton*** conspiracy liability.  ***See*** 1 Model Penal Code Commentaries Part I, § 2.06, at 307-08 (1985) ("The most important point at which the [MPC] formulation diverges from the language of many courts is that it does not make 'conspiracy' as such a basis of complicity in substantive offenses committed in furtherance of its aims."); ***see also Commonwealth v. Knox***, 105 A.3d 1194, 1198-99 (Pa. 2014) (Eakin, J., concurring) ("[C]onspiracy is a distinct crime—it is not a statutory theory of liability for criminal acts of other people.  If one conspires to commit a crime, one is guilty of conspiracy, but not the crime conspired.").  Therefore, we will not consider whether the evidence of aggravated assault is sufficient under a "conspiracy liability" theory.

crime scene or knowledge of the crime is insufficient to convict. *Id.* Finally, accomplice liability is offense-specific, meaning that the Commonwealth must prove accomplice liability for each criminal charge to which it applies. *Knox*, 105 A.3d at 1196-97.

The Crimes Code delineates two ways in which a person is considered an accomplice of the principal. First:

> **(c) Accomplice defined.--**A person is an accomplice of another person in the commission of an offense if:
>
> > (1) with the intent of promoting or facilitating the commission of the offense, he:
> >
> > > (i) solicits such other person to commit it; or
> > >
> > > (ii) aids or agrees or attempts to aid such other person in planning or committing it; or
> >
> > (2) his conduct is expressly declared by law to establish his complicity.

18 Pa.C.S.A. § 306(c). Section 306(c) requires proof that the person intended to promote or facilitate the offense. *Adams*, 39 A.3d at 324. The amount of aid required is minimal, and "even non-substantial assistance, if rendered with the intent of promoting or facilitating the crime, is sufficient to establish complicity." *Gross*, 101 A.3d at 35.

Second, a person can also be an accomplice as follows:

> When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense.

18 Pa.C.S.A. § 306(d). In **Commonwealth v. Roebuck**, 32 A.3d 613, 621-22 (Pa. 2011), our Supreme Court held that § 306(c) and (d) must be read *in pari materia*. Section 306(c) focuses on **conduct**, and requires proof of intent to trigger accomplice liability. Section 306(d) focuses on the **results** of conduct, and requires proof only of the *mens rea* that applies to the offense committed by the principal.

**Roebuck** explains the difference between accomplice liability for **intending** that the principal commit a crime, and accomplice liability for the **results** of the principal's actions. Roebuck was convicted of third-degree murder as an accomplice. **Roebuck**, 32 A.3d at 614. Roebuck contended it was impossible to be an accomplice to third-degree murder, because:

> accomplice liability attaches only where the defendant **intends** to facilitate or promote an underlying offense; third-degree murder is an **unintentional** killing committed with malice; therefore, to adjudge a criminal defendant guilty of third-degree murder as an accomplice would be to accept that the accused **intended** to aid an **unintentional** act, which is a logical impossibility.

**Id.** (emphases in original). After examining the MPC provision on which 18 Pa.C.S.A. § 306(c) and (d) is based, MPC § 2.06(3) and (4), the Supreme Court rejected Roebuck's impossibility argument.

> [MPC §] 2.06(4) thus prescribes that an accomplice may be held legally accountable where he is an "accomplice in the conduct"— or, in other words, aids another in planning or committing the conduct with the purpose of promoting or facilitating it—and acts with recklessness (*i.e.*, the "kind of culpability . . . sufficient for the commission of" a reckless-result offense).

*Id.* at 619. The commentary to MPC § 2.06(3), *i.e.*, the equivalent of § 306(c), makes clear that "commission of the offense" focuses on a person's **conduct**—not the result of that conduct. *Roebuck*, 32 A.3d at 619 (quoting MPC § 2.06 cmt. 6(b)). "This diffuses any impression that an accomplice must always intend results essential to the completed crime." *Id.*

Section 306(d), however, focuses on the results of a person's actions:

In terms identical to those of [MPC § 2.06(4)], **Section 306(d) of the Crimes Code directs the focus, for result-based elements, to the level of culpability required of a principal**. *See* 18 Pa.C.S. § 306(d). *See generally* [*Riley v. State*, 60 P.3d 204, 214 (Alaska 2002)] (explaining that a "great majority" of judicial decisions have followed the MPC in holding that an accomplice must not necessarily intend to cause the prohibited result (citations omitted)). In the present factual scenario, the purport is to avoid elevating a recklessness-oriented culpability requirement to a purposeful one relative to an accomplice. *Accord* [*State v. Anthony*, 861 A.2d 773, 775 (N.H. 2004)] ("[I]f the offense's mental state with respect to the result is something less than purposeful, the State need only establish the lesser *mens rea* on the part of the accomplice to prove him or her guilty of the offense."). The policy basis for such treatment is readily discernable, and a homicide committed with the degree of recklessness predicate to murder provides a paradigmatic example.

*Id.* at 621 (emphasis added) (footnote omitted).

We find *Roebuck* highly instructive here, if not dispositive. "For offenses where a principal actor need not intend the result, it is also not necessary for the accomplice to do so." *Id.* at 624. For aggravated assault, the principal need not intend to cause aggravated assault where the victim actually suffers serious bodily injury. *Patrick*, 933 A.2d at 1046 ("Where

the victim suffers serious bodily injury, the Commonwealth is not required to prove specific intent."). Rather, the Commonwealth needs to prove only that the defendant acted recklessly under circumstances manifesting an extreme indifference to the value of human life. *Id.* (quoting *Nichols*, 692 A.2d at 185). As the *Roebuck* court stated, it would be illogical to find the principal criminally liable for malice, *i.e.*, recklessness, while requiring the Commonwealth to prove that his accomplice intended to produce the result of the crime, the result being death in *Roebuck* and serious bodily injury here. Because the principal to a completed aggravated assault may be liable for recklessly causing serious bodily injury, an accomplice is also liable if he has the *mens rea* of recklessness.

With these standards in mind, we turn to the evidence in this case, construing it, and all inferences derivable therefrom, in a light most favorable to the Commonwealth. Appellant argued with Zsaron Simpson over the rules of the basketball game. Ellerbee attempted to break up the argument. Afterward, witnesses saw Appellant talking on his cellphone. During a break in the basketball game, the shooter entered the gym, exchanged a head nod with Appellant, walked past several other people, pulled a gun, and struck Zsaron Simpson in the face with it. Appellant tackled Zsaron Simpson and punched him. The shooter fired three shots. One struck Ellerbee in the stomach, a second grazed Ellerbee's ear and then Appellant (causing the graze wound), and the third struck Zsaron Simpson in the abdomen. After the shooter fired the shot that struck each victim, he

and Appellant left together. These facts show, at minimum, that Appellant acted recklessly under circumstances manifesting an extreme indifference to the value of human life. The facts support an inference that after the verbal altercation with Zsaron Simpson, Appellant called the shooter to the gym to participate in a fight with the victims. Because of the fight, each victim suffered serious bodily injury. Appellant, therefore, is liable for the aggravated assault of Zsaron Simpson and Ellerbee.

Under 18 Pa.C.S.A. § 306(d), Appellant is liable for all results of the principal's conduct **even if unintended**. It does not matter that Appellant may have lacked the specific intent to inflict **serious** bodily injury, as opposed to mere bodily injury (by tackling Zsaron Simpson and punching him). Interpreting § 306(d), the Supreme Court in **Roebuck** held that accomplice liability under the MPC **can** be extended to unintended consequences of reckless conduct. **Roebuck**, 32 A.3d at 620-21. In **Roebuck**, the Commonwealth did not prove that the defendant intended to kill the victim, but he was nevertheless liable for third-degree murder, *i.e.*, a murder for which the defendant does not intend to kill. **Id.** In this case, the Commonwealth similarly did not need to prove that Appellant intended cause serious bodily injury. Rather, it needed to show merely that Appellant acted recklessly under circumstances manifesting an extreme indifference to human life in bringing about the victims' injuries. The evidence was sufficient for the Commonwealth to meet its burden.

- 11 -

Appellant argues his tackling of Zsaron Simpson may have been an attempt to prevent him from being shot. The legal standard that applies to a sufficiency challenge forecloses Appellant's arguments concerning the facts. The jury, however, was free to reject this inference. In addition, Appellant mentions inconsistencies in Ellerbee's account of the head nod between Appellant and the shooter. The jury, however, was the proper arbiter of Ellerbee's credibility. On appeal, we must view the evidence in the light most favorable to the Commonwealth.

Appellant's cited cases regarding the drawing of inferences are distinguishable. ***Commonwealth v. Menginie***, 383 A.2d 870, 872-73 (Pa. 1978), concerned guilt as a **co-conspirator**—not as an accomplice. The issue was whether the Commonwealth proved an agreement, ***see id.***, which is not required for accomplice liability, ***see Adams***, 39 A.3d at 324. Thus, ***Menginie*** is irrelevant to addressing accomplice liability, which is a distinct concept. ***Knox***, 105 A.3d at 1198 n. 5. Likewise, ***State v. Madden***, 294 A.2d 609, 615 (N.J. 1972), concerned jury instructions—not the sufficiency of the evidence—and we find that case wholly unpersuasive.

Finally, we disagree with Appellant that the inferences drawn from the evidence are "unconstitutional." Appellant cites several federal cases, arguing that the Due Process Clause circumscribes the drawing of inferences. None of those cases, however, concerns the drawing of inferences from the facts and evidence presented at trial. Rather, all concern the use of statutory inferences and instructions thereon. ***See***

- 12 -

*Francis v. Franklin*, 471 U.S. 307, 309, 314-15 (1985) (addressing the mandatory rebuttable presumption that a person of sound mind is presumed to intend the natural and probable consequences of his acts); *County Court of Ulster County, N.Y. v. Allen*, 442 U.S. 140, 157-63 (1979) (rejecting a statutory presumption that presence of a firearm in automobile was evidence of illegal possession by all occupants); *Barnes v. United States*, 412 U.S. 837, 842-43 (1973) (addressing the common-law presumption that an "inference of guilty knowledge may be drawn from the fact of unexplained possession of stolen goods"); *Tot v. United States*, 319 U.S. 463, 466, 468 (1943) (addressing presumptions that a person who could not possess firearms under the Federal Firearm Act (1) received the firearm in interstate commerce and (2) subsequent to the Act's effective date).

In sum, we hold the evidence is sufficient to support a finding of guilt for each of Appellant's convictions of aggravated assault as an accomplice.

We now address Appellant's second issue, in which he argues the trial court erred in refusing to grant a mistrial that he requested during the Commonwealth's closing argument. Appellant alleges the Commonwealth personally vouched for the evidence several times. Appellant contends the prosecutor's use of "we know" was an impermissible use of her opinion as to the evidence, constituting improper bolstering. Appellant's Brief at 24-25. Appellant also contends the prosecutor referenced matters "far outside of the record." *Id.* Appellant argues the error was not harmless.

We review a trial court's denial of a mistrial in response to purported prosecutorial misconduct for an abuse of discretion. ***Commonwealth v. Hogentogler***, 53 A.3d 866, 878 (Pa. Super. 2012). A mistrial "is an extreme remedy required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial tribunal." ***Id.*** (quotation and internal quotation marks omitted). A lesser remedy, such as a cautionary instruction may cure prejudice caused by prosecutorial misconduct. ***See Commonwealth v. Rivera***, 939 A.2d 355, 358 (Pa. Super. 2007).

Even if prosecutorial misconduct occurred, and the trial court erred in attempting to remedy it, we must determine whether the error was harmless. ***Hogentogler***, 53 A.3d at 878. Harmless error is a doctrine of appellate review designed to advance judicial economy. ***Commonwealth v. Allshouse***, 36 A.3d 163, 182 (Pa. 2012) (quoting ***Commonwealth v. Thornton***, 431 A.2d 248, 251 (Pa. 1981)). If an appellate court is convinced beyond a reasonable doubt that trial court error is harmless, the appellate court may affirm instead of remanding for retrial. ***Id.***

In defining prosecutorial misconduct *vis-à-vis* statements in closing argument, Pennsylvania courts look to American Bar Association (ABA) Criminal Justice Standard § 5.8. ***Commonwealth v. Judy***, 978 A.2d 1015, 1019-20 (Pa. Super. 2009); ***see also Commonwealth v. Joyner***, 365 A.2d 1233 (Pa. 1976).

(a) In closing argument to the jury, the prosecutor may argue all reasonable inferences from evidence in the record. The prosecutor should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw.

(b) The prosecutor should not express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

(c) The prosecutor should not make arguments calculated to appeal to the prejudices of the jury.

(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence.

ABA Crim. Justice Stand. § 5.8 (3d ed. 1993).[6]

We have said, however, that a prosecutor must have "reasonable" or actually has "considerable" latitude during closing arguments to make arguments supported by the evidence and its reasonably derivative inferences. *Hogentogler*, 53 A.3d at 878 (noting "a prosecutor has considerable latitude during closing arguments") (quoting *Judy*, 978 A.2d at 1020); *Commonwealth v. Solomon*, 25 A.3d 380, 383 (Pa. Super. 2011) (noting "[a] prosecutor must have reasonable latitude in fairly presenting a case to the jury") (quoting *Commonwealth v. Rolan*, 964 A.2d 398, 410 n.10 (Pa. Super. 2008)). As such, a prosecutor may engage in "oratorical flair" and fairly respond to arguments made by defense counsel without committing misconduct. *Hogentogler*, 53 A.3d at 878. "Even an otherwise

_____

[6] Prior cases have quoted earlier editions. *See, e.g., Judy*, 978 A.2d at 1020 (quoting the 1980 second edition); *Joyner*, 365 A.2d 1233 (quoting the 1971 approved draft). The Third Edition is substantively identical to prior versions.

improper comment may be appropriate if it is in fair response to defense counsel's remarks." ***Commonwealth v. Burno***, 94 A.3d 956, 974 (Pa. 2014). Furthermore, a prosecutor cannot express a personal belief as to the defendant's or other witnesses' credibility, but the prosecutor can comment on credibility. ***Judy***, 978 A.2d at 1020. Finally, "prosecutorial misconduct does not take place unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict." ***Id.***

We turn to the prosecutorial conduct alleged in this case. Appellant references several remarks he argues constitute misconduct. We have provided a fuller quotation of the relevant parts of closing argument, to evaluate in context the allegedly improper remarks:

> [THE PROSECUTOR]: So we have this nod. But even if we don't have this nod, we know that two of them are working together or that the shooter knows what's going on, because he goes right to Zsaron.
>
> Ladies and Gentlemen, we know that there was contact made [between Appellant and the shooter]. Whether it was a phone call, whether it was the defendant telling somebody else to call the shooter, whether it was him walking out of the gym when nobody said it and telling the person to come in and shoot, we know that there was contact, we know that there was an agreement. We know that there was some way in which this defendant communicated to that person, you're going after Zsaron.
>
> Because he comes up to him, and without any sort of argument with the shooter, without any words spoken between Zsaron and the shooter, this person smacks him in the face with the butt of the gun.

\* \* \*

And it's at this point in time we have further evidence that this defendant is participating and involved in the assault. Because when Anthony [Ellerbee] pulls the shooter off of him, off of his cousin Zsaron, and the shooter puts the gun to Anthony's chest, pulls the trigger, and at that point Anthony doesn't even know that the gun has gone off, but he sees the smoke. The defendant comes to the shooter's aid. And we know this.

You don't have to just believe Anthony. You don't have to just believe Zsaron. You don't have to just believe Keith. Because there is physical evidence that this defendant, at that point in time, involved himself in the shooting.

As Anthony described it, and defense counsel tried hard, "Now, what was he doing? What was he doing while you pulled the shooter off?" And Anthony said, "I don't know. I don't know. I don't know."

But what we do know—and Anthony got up and showed it to you, Ladies and Gentlemen—is that when he is bent over and the shooter is beneath him, the defendant is to his right-hand side.

He can't see what he's doing but he knows he's there, because he turns around afterwards and sees him.

But not only do we have Anthony's testimony that he was right there, but we have the defendant's own injury. We have the graze wound to the left arm.

And Anthony said to you, it was that shot, the one that burned past my eyebrow and took the top part of my ear off that hit that defendant. And that is completely consistent with the physical evidence.

Number one, the injury to the defendant, the graze wound that Detective Kilman said he knew, just by looking at it, that it was a graze wound, based upon how long he's been on the force and how many gunshot wounds he's seen.

And we also have the projectile. There are three shots that everyone is clear were fired that night. There is the shot that ricocheted off his head and hit his ear, and there is the third shot which hit Zsaron in the stomach.

- 17 -

The projectile is recovered right here (indicating), right at this end of the court where that shooting took place, the shooting— that projectile which hit off of Anthony's head, hit his ear and then grazed the defendant.

We now have the physical evidence to corroborate Anthony's version of what happened that night.

* * *

These three men, Anthony, Zsaron[,] and Keith, they had different vantage points that night.

Zsaron was here at center court (indicating). And whenever that second argument unfolds, his attention is focused only on the defendant, who gets in his face at that point.

Anthony has the best vantage point, because he's over here closer to the center court with his back facing the benches (indicating). And he is facing and now has a full view of that entire court.

Keith has a somewhat better view than Zsaron, because he, again, is engaged in this argument. But at the same time, where is Keith standing? And then where were they standing was something that was relatively consistent with each one.

Again, there are going to be minor variations, but each one had Keith in and around this area, Anthony in and around this area[,] and Zsaron right there at center court (indicating).

So it makes sense that Keith isn't going to see any sort of recognition, any sort of head nod between the shooter and the defendant.

It makes sense that Keith isn't going to even see that shooter up until he gets around him and he hits his brother in the face with the gun.

It makes sense that Anthony is able to see all of that. It makes sense when Zsaron tells you what happened that night, all he can tell you is that there are two guys that get on top of him and that jump him, are the words that he used.

It makes sense that whenever he is fighting for his life, after being hit in the face with the butt of the gun, that he can't tell you exactly who's doing what or who's doing it where.

I even believe his recollection of where Anthony got shot was on this end of the court (indicating). But again, we know that Anthony's version is correct, because we have the projectile down here. We have Keith's account that Anthony got shot down here (indicating).

N.T. Trial, 1/9/12, at 54-55, 58-60, 67-69.

Following the conclusion of the Commonwealth's closing argument and outside of the jury's presence, Appellant objected and requested a mistrial, stating that the prosecutor had "inserted herself into the jury's realm" by using the words "we know." *Id.* at 87-88. In response, the trial court stated it would give a cautionary instruction to the jury, which it did during the general charge:

THE COURT: In addition, actions or conduct by counsel for either side should not be considered in your verdict.

What counsel think must not be considered by you. Argument is not evidence and may be considered by you only if it is supported by the evidence and appeals to your reasoning and logic.

*Id.* at 106.

In its Rule 1925(a) opinion, the trial court stated that the prosecutor used the phrase "we know" as a shorter way of saying "this has been shown by the evidence in this case." Trial Court Rule 1925(a) Opinion, 9/27/13, at 8 (quoting N.T. Trial 1/19/12, at 74). We agree.

When her remarks are viewed in context, the prosecutor was commenting on the evidence produced at trial in an attempt to persuade the jury to convict—the very purpose of closing argument. The term "we know"—in context—means "the evidence shows," as opposed to "we, the

Commonwealth, know facts that you, the jury, do not," as Appellant contends. For example, the prosecutor's statement that "[w]e now have the physical evidence to corroborate Anthony [Ellerbee's] version of what happened that night," N.T. Trial, 1/9/12, at 60, is a reference to her summary of that physical evidence that immediately preceded this remark: the gunshot wounds to Ellerbee and Appellant, *id.* And her comment that Ellerbee's version was the correct one, *id.* at 69, was an attempt to argue that his version of events was more accurate than the Simpson brothers' versions. In other words, the prosecutor's comments on the evidence were proper.

Moreover, the prosecutor did not tell the jury to "credit evidence that it did not hear, which 'nobody saw,'" Appellant's Brief at 25. Rather, she was telling the jury to draw reasonable inferences from the evidence. For example, the prosecutor suggested the jury infer that Appellant called the shooter to assault Zsaron Simpson. *See* N.T. Trial, 1/9/12, at 54-56. She asked the jury to base this suggested inference on the following facts: (1) Appellant and Zsaron Simpson had a verbal altercation; (2) afterward, Appellant was seen talking on a cell phone; (3) the shooter, not dressed to play basketball then arrived at the gym; (4) and the shooter walked past a crowd of players and attacked Zsaron Simpson without provocation. *See id.* The prosecutor did not give her personal opinion on the evidence, nor did she tell the jury to find Appellant guilty based on evidence not of record.

Appellant's cited cases are again distinguishable. In **Commonwealth v. Pfaff**, 384 A.2d 1179, 1182-83 (Pa. 1978), the prosecutor accused the defendant, on trial for rape and statutory rape, and his brother of assassinating the character of the victim—a 13-year-old girl—and repeatedly stated that the defendant and his brother were liars. In **United States v. DiLoreto**, 888 F.2d 996, 999 (3d Cir. 1988), *overruled in part by*, **United States v. Zeherbach**, 47 F.3d 1252 (3d Cir. 1995) (*en banc*), the prosecutor personally vouched for the government's witnesses, telling the jury, "We don't take liars. We don't put liars on the stand. We don't do that." In contrast, the prosecutor here did not vouch for the truthfulness of the Commonwealth's witnesses. Rather, she merely claimed that the physical evidence corroborated their testimony—an entirely proper argument.[7]

In sum, we do not find that the prosecutor made impermissible comments during her closing argument. The prosecutor's comments were proper, and Appellant's argument is without merit. Because no prosecutorial misconduct occurred, the trial court did not abuse its discretion in denying a mistrial. For this reason, we need not engage in a harmless error analysis.

---

[7] **United States v. Young**, 470 U.S. 1, 5-11, 20 (1985), concerned the fair response doctrine, and whether the prosecutorial misconduct in that case was plain error under Fed.R.Crim.P. 52(b), *i.e.*, error not requiring an objection to be preserved for appeal. Appellant's other cases, cited at page 25 of his brief, do not concern prosecutorial misconduct.

Having found that neither of Appellant's claims of error entitles him to relief, we affirm the judgments of sentence.

Judgments of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/20/2015