J-A27011-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| LARRY ERIC NELSON | |
| Appellant | No. 150 EDA 2019 |

Appeal from the Judgment of Sentence imposed December 18, 2018
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0011147-2013

BEFORE:  STABILE, J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY STABILE, J.:                    **FILED:  MARCH 19, 2021**

Appellant, Larry Eric Nelson (hereinafter, "Appellant" or "Nelson"), appeals from the December 18, 2018 judgment of sentence of the Court of Common Pleas of Philadelphia County.  On appeal, Appellant challenges the sufficiency of the evidence supporting his convictions for first- degree murder[1] and robbery.  Upon review, we affirm.

The relevant factual and procedural background can be summarized as follows.[2]  The victim, Thomas Watson, lived above a Häagen-Dazs ice cream

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Appellant erroneously states that Appellant was found guilty of second-degree murder.  In fact, Appellant was convicted of first-degree murder.

[2] The record before us is incomplete.  Appellant failed to include the full trial transcripts.  The trial spanned over two weeks.  Appellant, however, provided transcripts for only two trial days.  It is settled that an appellant bears the

store at 242 South Street in Philadelphia. He worked across town as a DJ at the Copabanana Club at 40th and Spruce Streets. At about 2:00 a.m. on May 11, 2013, after finishing work at the Copabanana, the victim texted James Weisbrod, who drove an unlicensed cab in Philadelphia, and asked Weisbrod for a ride. Weisbrod picked up the victim and another man, co-defendant Ronnie Robinson,[3] who worked as a security guard at the Copabanana. Weisbrod drove Robinson to an address in North Philadelphia. Weisbrod and the victim then stopped at a restaurant before driving to the victim's apartment. N.T. Trial, 10/10/18, at 94-97.

Weisbrod parked his Lincoln Town Car on American Street and then helped the victim unload his DJ equipment outside his apartment. The victim entered the closed Häagen-Dazs store, through which he had to walk in order to get to his second floor apartment. As Weisbrod was about to leave the area, he noticed that the victim had not moved his DJ equipment, which was still outside in the rain. Concerned, he returned to South Street and opened

_____

responsibility of ensuring that the certified record is complete for our review. *Commonwealth v. Lopez*, 57 A.3d 74, 82 (Pa. Super. 2012), *appeal denied*, 62 A.3d 379 (Pa. 2013). Moreover, it is black letter law in this jurisdiction that an appellate court cannot consider anything which is not part of the record in the case. *Commonwealth v. Boyd*, 679 A.2d 1284, 1290 (Pa. Super. 1996) (citation omitted), *appeal denied*, 689 A.2d 230 (Pa. 1997). Nonetheless, we decline to find waiver because our review of this appeal is not impeded. Appellant here proceeded with multiple co-defendants to a joint trial. As all co-defendants have appealed, we have access to the complete trial testimony through them.

[3] Ronnie Robinson is also known as "Lonnie Robinson," but for purposes of this appeal we shall refer to him only as "Ronnie Robinson".

the door to the Häagen-Dazs store. Co-defendant Clarence Pone blocked Weisbrod's path and told him, "Get the fuck out of here." *Id.* at 98, 101-02. Weisbrod got into his car, but instead of leaving the area, he circled the block and parked his car in front of the Häagen-Dazs store. When he heard two gunshots, Weisbrod got out of his car and walked into the store. As he entered, co-defendant Josephe Murray left the store. Weisbrod saw the victim lying on the ground behind the counter and called 911. *Id.* at 102-04.

At approximately 3:00 a.m., Philadelphia Police Officers Corson and Duffy were on patrol when they received a radio call for a robbery in progress at the Häagen-Dazs store. The officers entered the store and discovered the victim's body behind the ice cream counter. Officer Corson observed wounds to the victim's chest and head. While on the premises, the officers noticed signs of a struggle and heard a cell phone ringing, but they could not locate the phone. *Id.* at 75-79; N.T. Trial, 10/11/18, at 25-28.

Philadelphia Police Officer Coleman also heard the radio call for the Häagen-Dazs store robbery and learned that the suspects were last seen running down American Street wearing dark clothing. As he drove north on American Street, he noticed a discarded black hoodie and glove lying on the sidewalk. Officer Coleman covered the items with a heavy paper bag to protect them from the elements and turned them over to a crime scene investigator. Forensic testing later demonstrated that the victim's DNA was on the upper back portion of the hoodie. N.T. Trial, 10/11/18, at 53, 65, 68; N.T. Trial, 10/22/18, at 208.

- 3 -

Police officers reviewed camera footage from inside and outside the Häagen-Dazs store depicting the final moments of the victim's life. The video showed that one hour before the murder, two vehicles, a Honda and a green Ford Explorer, parked along the 200 block of South Street, where the drivers and occupants waited until Weisbrod and the victim arrived in Weisbrod's vehicle. As the victim entered the store, two men followed him inside and one produced a large handgun. The victim struggled with the two men, who kicked and beat him with the handgun. The video showed that Weisbrod attempted to enter the store but was stopped by an individual blocking his path. The victim was then shot. Weisbrod returned to the store, where a man with a bloodstained hoodie ran past him in the doorway and ran down the street. N.T. Trial, 10/11/18, at 159; N.T. Trial, 10/15/18, at 162-63, 168-79.

On May 12, 2013, one day after the shooting, Detective John Harkins recovered a Samsung TracFone (a pre-paid cellphone) from inside the store that had fallen underneath an ice cream machine. The officers submitted an exigent circumstances request for information to T-Mobile and learned that the phone had been shipped to a woman named Carmen Melton, who lived at 5718 Reedland Street. The officers reviewed the call logs to see if they could learn any information about the identities of individuals attempting to contact the phone. One telephone number was associated with a woman named Cheneka Jones, who lived at 5706 Reedland Street. The officers used a search database to determine who else was associated with that address. They saw

a photo of Murray and realized that he was one of the individuals in the video camera footage inside the Häagen-Dazs store. Detective Joseph Bamberski assembled a photo array that included Murray's photograph and showed it to Weisbrod, who positively identified Murray as the individual who had come to the door of the Häagen-Dazs store at the time of the shooting. N.T. Trial, 10/10/18, at 112, 116; N.T. Trial, 10/11/18, at 161-62; N.T. Trial, 10/15/18, at 81-87; N.T. Trial, 10/22/18, at 47.

On May 12, 2013, Detective Theodore Hagan interviewed Robinson, the man who rode with the victim in Weisbrod's vehicle. Robinson told the detective that he had left the Copabanana Club after work with the victim, who dropped him off at his house in North Philadelphia at approximately 2:45 a.m. Robinson also told Detective Hagan that victim had been in a fight with someone on South Street. N.T. Trial, 10/15/18, at 43, 44, 49, 56.

Meanwhile, detectives continued to examine call records from Murray's cell phone and learned that he had been in communication sixteen times on the night of the murder with a phone registered to Appellant, co-defendant Larry Nelson. N.T. Trial, 10/15/18, at 89.

Detective Bamberski prepared warrants to arrest Murray and search his residence at 5706 Reedland Street. On the morning of May 15, 2013, Murray was arrested at his home. Police officers recovered a pair of camouflage shorts that looked like the ones worn by the shooter in the video and proof of residency from the house. *Id.* at 90-92.

After receiving *Miranda*[4] warnings, Murray gave an inculpatory statement to Detective Bamberski (redacted for trial) in which he admitted shooting and killing the victim.[5] Murray explained that he owed a guy $5,000 for marijuana, so he agreed to rob the victim, who was known to have drugs in his apartment. Murray and Pone waited for the victim to arrive at the Häagen-Dazs store. When Weisbrod dropped the victim off at the store, Murray and Pone ran to the store, grabbed the victim, and dragged him to the back of the store. Weisbrod returned to the store, but Pone prevented him from entering the premises. Murray, who was alone with the victim, hit him with his gun. Murray asked him where the drugs were, but the victim continued to argue with him. Murray got a call from Nelson and was instructed to kill the victim. Murray shot him in the head, ran out of the store, and discarded his hoodie and glove while he fled. He also said that at the time of the shooting, he was using a TracFone he had purchased on the street. *Id.* at 98-119.

On the same day that Murray was arrested, Detective Francis Graf picked up Robinson at his home because Murray had implicated him in the murder. Officer Graf told Robinson that the police had more questions for him, and brought him to the Homicide Division. After reading him the

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[5] As discussed *infra*, Pone's trial testimony allowed the Commonwealth to connect all co-defendants to the victim's murder.

*Miranda* rights, the police obtained Robinson's confession. Specifically, Robinson gave a statement (redacted for trial) in which he said that he met the victim when they both worked together at the Copabanana Club. Robinson provided security for the victim and also picked up and dropped off money and drugs for him. Robinson stated that he knew the individual who was responsible for having the victim shot and killed. This individual (Nelson) came to the club on the night of the shooting and told Robinson that the victim "was sitting" on a lot of money and drugs and "[they were] going to get that tonight." Nelson instructed Robinson to call him to let him know when the victim would be getting home. Robinson also admitted that he knew Nelson planned to rob the victim because he had talked about doing it before in March. Robinson claimed that he told Nelson he did not want anything to do with the plan. Nelson, however, told Robinson that he would "take care of him" by paying Robinson for calling him to tell him when the victim "would be home." N.T. Trial, 10/23/18, at 23, 25, 40-43. Robinson further stated that on the night the victim was killed, he left the Copabanana with the victim in a cab. After the cab dropped him off, Robinson received a call from Nelson and told him that the victim was on his way home in a dark-colored Lincoln. The next day, Robinson read on Facebook that the victim had been killed. *Id.* at 43-44.

Nelson was also arrested on May 15, 2013. Philadelphia Police Officer Hindley was instructed to look for Nelson in the area of the 5400 block of

Angora Terrace. Officer Hindley noticed Nelson's 1997 Ford Explorer parked in the neighborhood, a vehicle that looked the same as one seen waiting outside the store on the surveillance video. Officer Hindley saw Nelson approach the vehicle and placed Nelson under arrest. Inside the car, police officers found Nelson's license and registration, as well as binoculars, black gloves and a box of ammunition. On Nelson's phone was information relating to Murray's arrest and a news report of the victim's homicide. N.T. Trial 10/22/18, at 6, 9-12, 26, 33-35; N.T. Trial, 10/23/18, at 112-19. On the morning of May 16, 2013, Nelson gave an inculpatory statement to Detective John Harkins. Nelson claimed that another guy had planned the robbery, and that his role was limited to introducing some of the participants to each other and acting as a lookout. Nelson called someone to tell him the victim was on his way home and he stated that he was also supposed to notify the other guy when the robbery was complete. N.T. Trial, 10/22/18, at 57, 64-65.

On May 16, 2013, as detectives learned more about the shooting, they prepared a photographic array that included a photo of co-defendant Pone and showed the array to Weisbrod. Weisbrod identified Pone as one of the two men he saw at the Häagen-Dazs store, and Detective Bamberski obtained an arrest warrant and warrant to search Pone's residence at 5622 Angora Terrace. The search warrant was executed on May 17, 2013. Inside Pone's house, police recovered a red Nike hat that resembled the hat worn by one of

the men on the video, and proof of residence for Pone.  N.T. 10/15/18, at 137-41.

Pone was arrested several days later, on June 4, 2013.  He, too, gave an inculpatory statement admitting to his involvement in the killing of the victim.  According to Pone, he was approached a few days before the shooting by Nelson who asked him if he wanted to make some quick cash.  When he said that he did, Nelson told Pone that "he had somebody that . . . was a pretty easy score  . . . just rough up the guy up and take his money."  A couple nights later, Nelson, who was driving his green Ford Explorer, picked up Pone and told him the plan was to go to the victim's house and steal his money and drugs.  Pone, Nelson, and Murray waited on South Street until the victim arrived.  After the victim entered the Häagen-Dazs store, Pone and Murray followed him, fought with the victim, and dragged him to the back of the store.  Murray pulled out a gun and they both roughed the victim up a "little bit."  Pone then saw Weisbrod return to Häagen-Dazs, so he intercepted Weisbrod at the front door and prevented him from entering the store.  Pone told the man to "get the fuck out of here" and followed him outside.  Pone then went home with Nelson.  N.T. 10/24/18, 138-55.

Appellant and co-defendants Murray, Pone, and Robinson jointly proceeded to a jury trial.  On October 26, 2018, Appellant was convicted of first-degree murder, robbery, burglary, and conspiracy to commit murder of the first degree.  On December 13, 1018, Appellant *pro se* filed a notice of

appeal. On December 18, 2018, Appellant was sentenced, *inter alia*, to life without the possibility of parole. On December 27, 2018, Appellant filed a post-sentence motion challenging the sufficiency and weight of the evidence. The motion was denied by operation of law on April 26, 2019. No subsequent appeal was filed.

On July 3, 2019, this Court issued a rule to show cause why the appeal should not be quashed as having been taken from an order that was not entered in the appropriate docket of the lower court. Counsel for Appellant failed to respond. On October 3, 2019, this Court entered an order informing the parties that the issue raised in the rule to show cause was referred to the panel assigned to decide the merits of the appeal.

On January 14, 2020, new counsel was appointed to represent Appellant. On May 15, 2020, we issued a rule to show cause why this appeal should not be quashed as Appellant failed to file a timely notice of appeal from the judgment of sentence imposed on December 18, 2018. Counsel for Appellant failed to file a timely response. On June 8, 2020, counsel for Appellant filed an application for an extension of time to file his brief.[6] On

---

[6] In the application, counsel for Appellant appears to address his failure to respond within 10 days of the May 15, 2020 order. Counsel seems to argue that the delay was due to his inability to obtain the record from previous counsel. Even if true, Appellant failed to explain what prevented him from filing his application for an extension of time within 10 days of the May 15, 2020 order.

June 10, 2020, we entered an order informing the parties that the issues of timeliness of the instant appeal had been referred to the panel assigned to decide the appeal. On June 15, 2020, we granted Appellant's application for an extension of time to file his brief.

This appeal followed. The trial court did not order Appellant to file a Rule 1925(b) statement, Appellant did not file a statement pursuant to Rule 1925(b), and the trial court did not file an opinion pursuant to Rule 1925(a).[7]

Preliminarily, we must determine whether we can entertain this appeal. *See Commonwealth v. Burks*, 102 A.3d 497, 500 (Pa. Super. 2014) ("This Court can raise the [timeliness of appeal] *sua sponte*, as the issue is one of jurisdiction to entertain the appeal."). As noted above, Appellant filed a *pro se* notice of appeal after being convicted but before the imposition of sentence. It is well established that a direct appeal in a criminal case can only lie from the judgment of sentence. *See*, *e.g.*, *Commonwealth v. Kuykendall*, 2 A.3d 559, 560 n.1 (Pa. Super. 2010). Thus, appealing from the verdict is premature. However, Pa.R.A.P. 905(a)(5) provides that: "A notice of appeal after the announcement of a determination but before the entry of an appealable order shall be treated as filed after such entry and on the day thereof." Pa.R.A.P. 905(a)(5). Applying Rule 905 to the instant matter, we conclude that this appeal is properly before us.

_____

[7] The record shows that the presiding judge, the Honorable Steven Geroff, retired after the trial.

In an inartfully drafted brief,[8] Appellant argues that there was insufficient evidence supporting his convictions for robbery and first-degree murder. We disagree.

Regarding sufficiency of the evidence challenges, our standard of review is *de novo*, however, our scope of review is limited to considering the evidence of record, and all reasonable inferences arising therefrom, viewed in the light most favorable to the Commonwealth as the verdict winner. ***See Commonwealth v. Rushing***, 99 A.3d 416, 420-21 (Pa. 2014).[9]

In connection with the robbery conviction, Appellant argues in a single sentence that he could not be convicted of robbery because "the evidence does not show that Appellant attempted to commit a theft." Appellant's Brief at 10. We interpret this statement as a challenge to the jury's finding that

_____

[8] In violation of Pa.R.A.P. 2111, 2117, and 2119, Appellant failed to: (i) include a statement of the facts, (ii) provide any authority for any of his claims, and (iii) elaborate on his claims. We also note that the statement of questions involved "must state concisely the issues to be resolved, expressed in the terms and circumstances of the case[.] . . . No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby." Pa.R.A.P. 2116(a). Here, Appellant's statement of questions involved reads as follows: "Did the trial court err in their [sic] judgment of sentence of Appellant?" Appellant's Brief at 7. Under well-established law, a finding of waiver is inescapable. ***See*** Pa.R.A.P. 2116(a); ***Commonwealth v. Bryant***, 57 A.3d 191, 196 n.7 (Pa. Super. 2012) (defendant waived challenges to weight and sufficiency of evidence supporting indecent assault conviction for failure to include such challenges in his statement of questions). Despite being clearly inadequate, however, we decline to find waiver on this basis.

[9] Appellant does not challenge any facts. Appellant merely challenges the legal conclusions drawn from those facts.

Appellant was vicariously liable for others' conduct, which we address *infra*. Elsewhere, however, Appellant seems to suggest that the claim can be interpreted as a challenge to whether a robbery was committed, not whether Appellant could be found liable for others' conduct. To the extent that Appellant argues no robbery was committed because there is no evidence of an attempted theft, Appellant fails to point to anything in the record that would support the claim, a violation of Pa.R.A.P. 2119(c). The claim is therefore, waived.

In any event, the record shows otherwise. It shows that Appellant recruited Pone as a part of a plan to get "quick cash" from an "easy score." Reviewing the claim in the light most favorable to the Commonwealth as the verdict winner, we conclude that there is sufficient evidence that a robbery took place.

Appellant also seems to argue that a robbery was not committed because there is no indication that anything was taken from the victim. A conviction, however, for robbery will stand regardless of whether the accused succeeds in obtaining any money or other property from the victim. ***See***, ***e.g***., ***Commonwealth v. Brandon***, 79 A.3d 1192, 1195 (Pa. Super. 2013).

In connection with the first-degree murder conviction, Appellant's entire argument consists of the following sentence: "Appellant argues that since there was no attempt to commit a theft, and Appellant had left the scene of the crime before decedent was shot, he cannot be held responsible for [first-

degree murder] as either the principal or an accomplice." Appellant's Brief at 10.

Failure to provide this Court with appropriate argument and citation to applicable legal authority usually results in waiver. *See*, *e.g.*, *Commonwealth v. Spotz*, 18 A.3d 244, 281 n.21 (Pa. 2011) ("without a developed, reasoned, supported, or even intelligible argument[, t]he matter is waived for lack of development"); *Commonwealth v. Hunzer*, 868 A.2d 598, 509 (Pa. Super. 2005) ("[a]ppellant has failed to cite any legal authority whatsoever in support of this argument, and has thereby waived the claim. . . . Pa.R.A.P. 2119(b))"; *Commonwealth v. Heilman*, 867 A.2d 542, 546 (Pa. Super. 2005) (recognizing that failure to provide "such discussion and citation of authorities as are deemed pertinent" may result in waiver).

To the extent that the argument is reviewable, Appellant fails to explain why he could not be found criminally liable for murder and robbery under a vicariously liability theory. Much can be said about the substantial differences between conspiracy and complicity,[10] how differently the two concepts may affect the instant matter, and how criminal liability may extend to include responsibility for others' conduct as a result of a finding of conspiracy or complicity. Yet, Appellant failed to do so. In fact, Appellant merely argues that he could not be found guilty of first-degree murder or robbery because

_____

[10] *See*, *e.g.*, *Commonwealth v. Roebuck*, 32 A.3d 613 (Pa. 2011).

he was not present at the time of the commission of said crimes. It is well-established law that absence (or presence) at the crime scene alone is not dispositive of a defendant's criminal liability; similarly, it is well-established that one can be found criminally liable for others' conduct under a vicariously liability theory.

In *Commonwealth v. Fisher*, 80 A.3d 1186 (Pa. 2013), our Supreme Court noted:

> Where the existence of a conspiracy is established, the law imposes upon a conspirator full responsibility for the natural and probable consequences of acts committed by his fellow conspirator or conspirators if such acts are done in pursuance of the common design or purpose of the conspiracy. Such responsibility attaches even though such conspirator was not physically present when the acts were committed by his fellow conspirator or conspirators and extends even to a homicide which is a contingency of the natural and probable execution of the conspiracy, even though such homicide is not specifically contemplated by the parties [.]

*Id.* at 1192 (quoting *Commonwealth v. Eiland*, 301 A.2d 651, 653 (Pa. 1973) (internal citation and quotation marks omitted)).

In *Commonwealth v. Gross*, 101 A.3d 28 (Pa. 2014), our Supreme Court noted: "Absence or presence at the scene and the participant's role in the complicity are not dispositive of whether accomplice liability exists." *Id.* at 35.

Finally, in *Commonwealth v. Murphy*, 884 A.2d 1228 (Pa. 2004), our Supreme Court noted:

> It is well-established, however, that a defendant, who was not a principal actor in committing the crime, may nevertheless be liable for the crime if he was an accomplice of a principal actor. *See* 18

> Pa.C.S. § 306; *see also Commonwealth v. Bradley*, 481 Pa. 223, 392 A.2d 688, 690 (1978) (the actor and his accomplice share equal responsibility for commission of a criminal act).

*Id.* at 1234.

In light of the foregoing, we conclude Appellant's claim that his absence from the crime scene shields him from criminal liability is meritless.

We also conclude that the evidence was sufficient to support Appellant's conviction on the grounds of conspiracy and accomplice liability.

A person commits criminal conspiracy if (1) he intends "to commit or aid in the commission" of a crime; (2) he enters "into an agreement with another [a 'co-conspirator'] to engage in the crime;" and (3) he "or one or more of the other co-conspirators" commits an overt act in furtherance of their agreement. *Commonwealth v. Le*, 208 A.3d 960, 969 (Pa. 2019). Because direct evidence of criminal intent and conspiratorial agreement is rarely available, these elements are generally proven through circumstantial evidence, such as "the relations, conduct[,] or circumstances of the parties, or overt acts on the part of co-conspirators." *Id.* Among the circumstances that are relevant, but not sufficient by themselves, to prove a corrupt confederation are: (1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy. *Commonwealth v. Jordan*, 212 A.3d 91, 97 (Pa. Super. 2019). "While such circumstances are insufficient standing alone, they may furnish a web of

evidence linking an accused to an alleged conspiracy beyond a reasonable doubt when viewed in conjunction with each other and in the context in which they occurred." ***Commonwealth v. Carter***, 416 A.2d 523, 524 (Pa. Super. 1979) (internal quotations omitted).

Accomplice liability does not create a new or separate crime, but merely "provides a basis of liability for a crime committed by another person." ***Gross***, 101 A.3d at 35. This Court has described the concept of accomplice liability as follows:

> Two prongs must be satisfied for a person to be labeled an accomplice. First there must be evidence that the person intended to aid or promote the underlying offense. Second there must be evidence that the person actively participated in the crime by soliciting, aiding, or agreeing to aid the principal. Further, a person cannot be an accomplice simply based on evidence that he knew about the crime or was present at the crime scene. There must be some additional evidence that the person intended to aid in the commission of the underlying crime, and then aided or attempted to aid. For purposes of accomplice liability, no agreement is required, only aid. With regard to the amount of aid, it need not be substantial so long as it is offered to the principal to assist him in committing or attempt to commit the crime. The least degree of assistance in committing the offense is adequate to sustain the finding of responsibility as an accomplice.

***Commonwealth v. Adams***, 39 A.3d 310, 324 (Pa. Super. 2012) (quotation marks and citations omitted), ***aff'd*** 104 A.3d 511 (Pa. 2014); ***see also*** 18 Pa.C.S.A. § 306. Moreover, accomplice liability "may be established wholly by circumstantial evidence." ***Commonwealth v. Mitchell***, 135 A.3d 1097, 1102 (Pa. Super. 2016) (citation omitted), ***appeal denied***, 145 A.3d 725 (Pa. 2016).

Viewing the evidence detailed above in a light most favorable to the Commonwealth, the record shows that Nelson, who personally recruited all members of the criminal enterprise, was the mastermind behind the robbery and the murder of the victim. Specifically, the record shows that: (i) Murray robbed and killed the victim on Nelson's instructions; (ii) Robinson agreed to provide Nelson with information about the victim's whereabouts; (iii) Pone agreed to assist Nelson in the robbery of the victim, (iv) on the night of the crimes, Robinson informed Nelson about the victim's whereabouts; (v) Nelson, Murray, and Pone went to the area of the ice cream store and waited until the victim arrived; (vi) after the victim entered the Häagen-Dazs ice cream store, Murray and Pone followed the victim inside, where the victim was beaten and eventually killed.

In light of the foregoing evidence, viewed in the light most favorable to the Commonwealth, we conclude that the Commonwealth proved Nelson's criminal liability for the robbery and murder of the victim under theories of conspiracy and accomplice liability.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/19/21