J-S31043-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| KHAREE MUHAMMAD | : | |
| | : | |
| Appellant | : | No. 1036 EDA 2020 |

Appeal from the Judgment of Sentence Entered February 28, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008182-2015

BEFORE: STABILE, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    Filed: November 18, 2021

Kharee Muhammad (Muhammad) appeals from the judgment of sentence imposed by the Court of Common Pleas of Philadelphia County (trial court) after his jury conviction for second-degree murder,[1] four counts of robbery[2] and related crimes.[3] He challenges the (1) sufficiency of the evidence to sustain the second degree murder conviction, alleging the Commonwealth failed to prove identification and *mens rea*; and (2) the

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(b).

[2] 18 Pa.C.S. § 3701(a)(1)(l).

[3] The related crimes included possessing an instrument of crime, criminal conspiracy, firearms not to be carried without a license and carrying firearms in public in Philadelphia. 18 Pa.C.S. §§ 907(a), 903, 6106(a)(1), 6108.

legality of his sentence on the basis that the second-degree murder and robbery convictions should have merged for sentencing purposes. After our careful review, we vacate the judgment of sentence with respect to the robbery of the murder victim only and affirm in all other respects.

We take the following factual background and procedural history from the trial court's November 30, 2020 opinion and our independent review of the record.

**I.**

The charges in this matter relate to the June 10, 2014 robberies of four individuals[4] by Muhammad (aka Kaz), Tim Jordan (aka T1), Andrew Baker, Joshua Voght and Brandon Munroe (aka B-Dub). The incident resulted in the fatal shooting of Mora as he attempted to flee. On October 8, 2014, police arrested Muhammad and charged him with the foregoing crimes.[5] Following a preliminary hearing on August 12, 2015, he was bound over for trial and jury selection began on November 14, 2019. The Commonwealth presented the trial testimony of approximately 20 people, including co-conspirators

---

[4] The victims included Humberto Sarmiento, Jose Miguel Colon-Torres, Ruben Dario Pasquel-Lopez and Decedent Moises Mora. (*See* Information, 10/18/15).

[5] Muhammad was also charged with burglary, 18 Pa.C.S. § 3502(a)(1), of which he was later acquitted. The Commonwealth *nolle prossed* charges of theft by unlawful taking, 18 Pa.C.S. § 3921(a), and receiving stolen property, 18 Pa.C.S. § 3925(a), and the conspiracy charges related to them.

Joshua Voght and Andrew Baker;[6] Philadelphia Police Officers Christopher Daukaus, Christopher Hyk and Derrick Suragh; Deputy Medical Examiner Dr. Albert Chu; expert witness Detective James Dunlap; Philadelphia Crime Scene Unit (CSU) Officer Terry Tull; robbery victim Humberto Sarmiento; eyewitness Jorge Blanco; and witnesses Jennifer Wong and Philip Dawson.

> Joshua Voght testified for two days. This co-conspirator told the jury that in June of 2014, he was living [on] Wingoshocking Street in Philadelphia with his girlfriend, Jennifer Wong, her three sons and another girl. (*See* N.T. Trial, 11/21/19, at 7-8). In the early afternoon of June 10th, he drove with his girlfriend Wong, in his dark blue Hyundai Sonata, to 17th and Dauphin Street to meet up with his friend Andrew [Baker]. (*See id.* at 9-14). They had been hanging out for a while when Andrew asked if he and a friend could borrow Joshua's car. (*See id.* at 16). Voght ignored the request and later Andrew [and Muhammad] asked if [Voght] could give some people a ride. Prior to getting in the car, they explained to Voght that they were going to rob somebody and that they would split some of the money with him. When they were proposing the robbery, Voght was sitting in the driver's seat, Andrew in the front passenger seat and Muhammad in the back seat behind the driver. This witness testified he had known Muhammad before, hanging out with him and talking about robbing a neighborhood drug house on previous occasions. (*See id.* at 16-28). They pulled around the corner on to Susquehanna Avenue where two other young men got into the car. (*See id.* at 29-30). Voght had never seen these two individuals before, but eventually identified all of the individuals involved. (*See id.* at 29, 77-79; N.T. Trial, 12/03/19, at 10-12). The five decided to rob a barbershop in the area of 63rd and Haverford Avenue in West Philadelphia. They drove past the barbershop and around the block a couple of times. The guys in the back of the car were against going through with that robbery, because there was a man outside of the shop talking on his phone and it looked suspicious

---

[6] In exchange for their guilty pleas to lesser charges, Voght and Baker testified on behalf of the Commonwealth. (*See* N.T. Trial, 11/21/19, at 114-18; N.T. Trial, 12/04/19, at 117-21).

to them. (**See** N.T. Trial, 11/21/19, at 30-31, 82-86). Muhammad suggested that they rob the drug house around the corner from Joshua's house. (**See id.** at 32, 85, 159). They drove back to the area of Caskey Street, near where [Voght] lived. Having decided to rob the drug dealers on that street, Voght told the guys in the car that he could not drive down that road because people knew him as well as his car, so he let the three guys in the back seat out on Blavis Street, then he parked on that street's intersection with 5th Street [by a Metro PCS store]. (**See id.** at 35-40, 44). Shortly after, the three guys ran back to the car and told Voght to pull off relating that they had shot one of the robbery victims as he tried to run away. (**See id.** at 89). [The three men stole marijuana and a little bit of money from the victims. (**See id.** at 56, 59, 64).] They drove back to 17th and Dauphin where the others got out of Voght's car and went their separate ways. (**See id.** at 47-50, 85-92). He and his girlfriend went home. The witness confirmed that the police later arrived at his house and took him down to homicide for a statement. (**See id.** at 53-67). Eventually, Voght agreed to plead guilty to criminal conspiracy, four counts of robbery and eight counts of theft and additionally agreed to testify against the remaining defendants. (**See id.** at 114-18, 187).

* * *

Another co-defendant, Andrew Baker, took the stand identifying Jordan and Muhammad standing trial, recounting everyone's participation in the events and corroborating Voght's testimony. Baker told the jury that on the 10th of June he was around Chadwick and Dauphin Streets when [Voght] pulled up with Jen [Wong], his girlfriend. This witness verified Voght's testimony that Kaz [(Muhammad)] suggested robbing the drug house around the corner from Voght's house, which was rejected at the time, and the men then settled on robbing a barbershop in West Philadelphia. Baker recounted how he, Voght, and Kaz [(Muhammad)] got in the car and drove away, picking up B-Dub [(Brandon Munroe)] and T1 [(Tim Jordan)], and driving out to the barbershop. Again, this witness validated the co-defendant's previous testimony that the men canceled their plans to rob the barbershop because 'it didn't look right.' (**See** N.T. Trial, 12/04/19, at 70-81, 194). Baker confirmed that they all drove back to North Philly where [Voght] identified the house where the drugs were sold, as well as that [Muhammad], [Tim Jordan] and [Brandon Munroe] jumped out of the car after telling Josh [Voght]

and Andrew [Baker] to park. The three assailants ran back towards the drug house, and when they returned, [Tim Jordan] said, "Pull off. I shot him." (*Id.* at 85) (*see id.* at 81-84). [Baker identified Muhammad, Jordan and Munroe running away from the murder scene in surveillance footage from a local Metro PCS store. (*See id.* at 124).]

(Trial Court Opinion, 11/20/19, at 10-12) (record citation formatting and some record citation page numbering provided).

Ms. Wong testified that at the time of the incident, she was living at the Wingoshocking address with Voght and her children. On that day, she had gone for a ride with Voght when he went to see Andrew Baker on Dauphin Street. The males spoke for a while, then drove off, leaving Ms. Wong on Dauphin Street for approximately one hour. Voght appeared nervous when he returned with Andrew Baker and two other men. She and Voght returned home. A little while later, the police appeared there and separately took Ms. Wong and Voght to police headquarters for statements. At the police station, Ms. Wong identified photographs of some of the individuals she had seen that day on the corner and upon getting in the car. Philadelphia Police Detective Philip Nordo[7] showed Ms. Wong a photo array at her home on June 13, 2014, and despite his encouragement, she was unable to identify anyone. Detective Nordo returned to Voght and Wong's home on August 14, 2014, at which time she identified Muhammad as the black male with dreadlocks or braids, stating

---

[7] Detective Nordo did not testify at trial.

he was familiar because she had seen him on her porch before with Voght. At trial, she identified Muhammad as one of the five individuals who had been in the Hyundai on June 10, 2014. (*See* N.T. Trial, 11/20/19, at 10-53, 40, 101, 132, 155-59).

Robbery victim Humberto Sarmiento testified that three armed black males approached him, Pasqual-Lopez and Colon-Torres[8] outside 433 Caskey Street demanding money. Mora, who was standing at the doorway, ran into the house when he saw the three defendants approaching. One of the three assailants, who was armed with a revolver, ran into the house after Mora. The other two attackers remained outside demanding money, one with what Sarmiento believed was a .9 millimeter and one with a .45 caliber. When he attempted to give them his cell phone, they pushed it away, but he saw Pasqual-Lopez and Colon-Torres handing them their wallets and cell phones. Sarmiento heard a gunshot from inside the house and the two attackers who remained outside told him to shut up and not say anything. As the three assailants ran toward 5th Street, Sarmiento and his two friends tried to chase them, but they got into a vehicle and got away. He did not identify Muhammad either before or at trial. (*See* N.T. Trial, 11/19/19, at 51-56).

---

[8] Pasqual-Lopez did not respond to subpoenas left at his mother's residence and Colon-Torres refused service and advised he would not appear in court. (*See* N.T. Trial, 12/09/19, at 15-16).

Jorge Blanco testified that he lived near the scene of the shooting. He looked outside when he heard the gunshot and saw Sarmiento, Colon-Torres and a male with a gun on the steps of 433 Caskey Street. He did not see Pasquel-Lopez. He described the armed assailant he saw standing with his neighbors as approximately 6'1" and skinny, wearing a gray hooded sweatshirt and black pants, with a silver .44 caliber firearm without an extended clip. Mr. Blanco stated he then saw two black men come running out of the house and Sarmiento and Colon-Torres chase them. He did not identify Muhammad before or during trial. (*See* N.T. Trial, 11/19/19, at 95-101, 108-09, 126, 129-30, 166-68).

Witness Philip Dawson testified that on June 10, 2014, he was working in the area of the shooting in the late afternoon when he heard a commotion and saw a group of young men running from Caskey Street to North 5th Street and onto Blavis Street. Thirty second later, he observed the men in a black Hyundai pull off Blavis Street and onto 5th Street before speeding away. He wrote down the license plate of the vehicle because the incident seemed suspicious. (*See* N.T. Trial, 11/18/19, at 78-82). Expert witness Detective James Dunlap testified that video surveillance of the area from a Metro PCS store showed the black Hyundai pulling up on Blavis Street and crossing 5th Street. A short time later, three individuals ran past the store and then the black Hyundai exited Blavis Street onto 5th Street. (*See id.* at 119-23).

Officer Christopher Hyk was working as a plainclothes officer on June 10, 2014, and spoke with Mr. Dawson that evening. Mr. Dawson provided him with the tag number of the Hyundai he had seen leaving the area earlier. Later that evening, Officer Hyk and his partner found the Hyundai near to where the shooting had taken place and on the same street as the vehicle's registered Wingoshocking address. Homicide detectives met Officer Hyk and went to the residence while Officer Hyk remained outside by the vehicle. Voght came outside and gave the police the keys to the Hyundai, which was towed to the police garage. (*See* N.T. Trial, 11/18/19, at 130-36, 141-44).

Officer Christopher Daukaus testified that he and his partner were the first to respond to the radio bulletin of a male shot on the highway on the 400 block of West Caskey Street in North Philadelphia. When they arrived at the scene, they observed the wounded Mora in the back of a pickup truck. The officers took him to Temple Hospital. (*See* N.T. Trial, 11/18/19, at 48-49). Dr. Albert Chu testified that the bullet had struck Mora in the left side of the central or lower back, ultimately traveling to the left lung and heart. He opined that to a reasonable degree of medical certainty, the cause of death was the gunshot wound and the manner of death was homicide. (*See* N.T. Trial, 11/18/19, at 73-76).

Officer Derrick Suragh testified that he worked that day, responded to the radio call and secured the 433 West Caskey Street location where he observed shell casings and blood. (*See* N.T. Trial, 12/03/19, at 83-89).

Officer Suragh spoke with four witnesses who gave him a description of the assailants and he transported two of them to the homicide division where they and the officer gave statements. (*See id.* at 89-107).

CSU Officer Terry Tull presented the photographs taken of the crime area and evidence collected. He also photographed, examined and collected evidence from the towed Hyundai, including a swab from a water bottle that contained a DNA mixture belonging to Muhammad and Brandon Munroe. (*See* N.T. Trial, 11/18/19, at 165-230). Baker's cell phone records showed that he had contact with all his co-conspirators except Muhammad. (*See id.* at 118-23).

On December 13, 2019, the jury convicted Muhammad of second-degree murder, four counts of robbery and related crimes. On February 28, 2020, in reliance on a presentence investigative report (PSI), the court imposed a mandatory term of life without parole on the murder charge. It also sentenced Muhammad to not less than five nor more than ten years' imprisonment for each of the four robbery counts to run consecutively to each other, but concurrently to his life imprisonment sentence. It also sentenced Muhammad to a concurrent term of imprisonment of not less than five nor more than ten years for criminal conspiracy. Muhammad filed a timely post-sentence motion challenging the sufficiency and weight of the evidence, which the court denied on March 10, 2020. (*See* Post-Sentence Motion, 3/06/20, at

1-2) (pagination provided).  Muhammad timely appealed.  He and the court have complied with Rule 1925.  **See** Pa.R.A.P. 1925.

## II.

## A.

In his first issue, Muhammad claims that the evidence was insufficient to establish second-degree murder where the Commonwealth failed to prove identification or the required *mens rea*.[9]  (**See** Muhammad's Brief, at 15, 18-20).  Specifically, he maintains that being driven to the scene by Voght is insufficient evidence of his presence at the crime where the eyewitnesses to the robbery did not identify him and Voght and Baker did not witness either the robbery or the shooting.  (**See id.** at 18).  He further argues that even if

_____

[9] Our standard of review of this matter is well-settled:

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.  Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty.  Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Sebolka*, 205 A.3d 329, 336–37 (Pa. Super. 2019) (citation omitted).  "[T]he Commonwealth may sustain its burden by means of wholly circumstantial evidence."  *Commonwealth v. Chmiel*, 889 A.2d 501, 517 (Pa. 2005), *cert. denied*, 549 U.S. 848 (2006) (citation omitted).

the identification evidence is sufficient, the Commonwealth failed to establish *mens rea* where the record reflects that he was not the shooter and was outside the residence when Mora was killed inside. (***See id.*** at 19).

"A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony." 18 Pa.C.S. § 2502(a). The "perpetration of a felony" is "[t]he act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery[.]" 18 Pa.C.S. § 2402(d).

"The statute defining second degree murder does not require that a homicide be foreseeable; rather, it is only necessary that the accused engaged in conduct as a principal or an accomplice in the perpetration of a felony." ***Commonwealth v. Lambert***, 795 A.2d 1010, 1023 (Pa. Super. 2002) (evidence sufficient for second-degree murder when appellant "drove Co-Defendant to the scene of the crime, waited during the commission of the crime and facilitated the flight afterwards."); ***see also Commonwealth v. Rivera***, 238 A.3d 482, 500 (Pa. Super. 2020), *appeal denied*, 250 A.3d 482 (Pa. 2021) ("Not only the killer, but all participants in a felony, including the getaway driver, are equally guilty of felony murder when a killing by a felon occurs.") (citation omitted). "It does not matter whether the appellant anticipated that the victim would be killed in furtherance of the conspiracy. Rather, the fact finder determines whether the appellant knew or should have

known that the possibility of death accompanied a dangerous undertaking."
*Lambert*, *supra* at 1023 (internal citation omitted); *see id.* at 1022 ("The malice or intent to commit the underlying crime is imputed to the killing to make it second-degree murder, regardless of whether the defendant actually intended to physically harm the victim.") (internal citations omitted).

Here, Voght and Baker both testified that Muhammad proposed the robbery that led to the death of the victim. (*See* N.T. Trial, 11/21/19, at 32, 85, 159; N.T. Trial, 12/03/19, at 11; N.T. Trial, 12/04/19, at 81-82, 194). They testified that Muhammad, Jordan and Munroe got out of the car to commit a robbery at the targeted drug house. (*See* N.T. Trial, 12/03/19, at 11; N.T. Trial, 12/04/19, at 83, 84). Baker testified that when the three men returned to the Hyundai, they reported that one of the victims (Mora) had fled, that Munroe had shouted, "get his ass," and Jordan admitted that he shot him. (*See* N.T. Trial, 12/04/19, at 83-85). Baker also identified Muhammad in the video surveillance footage running away from the crime scene. (*See* N.T. Trial, 12/04/19, at 124).

In addition to the testimony of Voght and Baker, one of the robbery victims, Sarmiento, testified that three armed men robbed him and his friends and shot Mora in the back when he tried to escape. (*See* N.T. Trial, 11/19/19, at 53-55). Deputy medical examiner Dr. Chu testified that the victim died from a gunshot wound to his back. (*See* N.T. Trial, 11/18/19, at 73-74). Witness Dawson saw the three robbers running up the street, turn a corner

and Voght's dark-colored Hyundai, whose license plate he recorded, speed away. (**See** N.T. Trial, 11/18/19, at 78-82).

Viewing the foregoing evidence, we conclude that it was sufficient to establish that Muhammad was a participant in the second-degree murder of Mora with the required *mens rea*. **See Chmiel**, **supra** at 517; **Lambert**, **supra** at 1023. Muhammad's first issue lacks merit.[10]

## B.

In his second claim of error, Muhammad maintains that his sentence is illegal because his convictions for second degree murder and robbery should have been merged for sentencing purposes.[11] (**See** Muhammad's Brief, at 20-21). The Commonwealth responds that only one of the four robbery counts

---

[10] Muhammad's arguments that the evidence was insufficient because Sarmiento and Blanco did not identify him, there was conflicting testimony about details, and because Voght and Baker were not credible because they were polluted sources, go to the weight of the evidence and not its sufficiency. The jury had this evidence in front of them and it was within their province to determine the weight and credibility it should receive. **See Commonwealth v. Charlton**, 902 A.2d 554, 562 (Pa. Super. 2006), *appeal denied*, 911 A.2d 933 (Pa. 2006) ("It was within the province of the jury as fact-finder to resolve all issues of credibility, resolve conflicts in evidence, make reasonable inferences from the evidence, believe all, none, or some of the evidence, and ultimately adjudge appellant guilty.") (citation omitted).

[11] This issue implicates the legality of sentence and is non-waivable. Hence, although Muhammad failed to raise it in his post-sentence motion or Rule 1925(b) statement, we will review its merits. **See Commonwealth v. Parham**, 969 A.2d 629, 631 (Pa. Super. 2009). Our standard of review is *de novo* and our scope of review is plenary. **See Commonwealth v. Williams**, 920 A.2d 887, 889 (Pa. Super. 2007).

should have been merged for sentencing purposes, and that remanding for resentencing is not necessary where it does not affect the trial court's sentencing scheme. (*See* Commonwealth's Brief, at 11-12).

A court cannot sentence a defendant "for felony murder as well as … for the predicate offense. In other words, a predicate felony and second-degree murder *ipso facto* (1) arise from a single criminal act, and (2) all of the elements of the predicate felony are included within the elements of second-degree murder." **Commonwealth v. Leaner**, 202 A.3d 749, 784 (Pa. Super. 2019), *appeal denied*, 216 A.3d 226 (Pa. 2019) (citation omitted); **see also** 42 Pa.C.S. § 9765.[12]

> This Court has explained:
>
> The doctrine of merger applies when one crime "necessarily involves" another, that is, if the essential elements of both crimes are the same and no additional facts are needed to prove the additional offense, the additional offense merges into the primary offense for sentencing purposes and only one sentence may thereafter be imposed.

**Commonwealth v. Adams**, 39 A.3d 310, 325 (Pa. Super. 2012) (citation and most quotation marks omitted). For multiple felonies to merge into a

---

[12] Pursuant to Section 9765 of the Judicial Code:

> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S. § 9765.

second-degree murder sentence, they must all merge into one another. *See Commonwealth v. Maddox*, 453 A.2d 1010, 1015 (Pa. Super. 1982).

In this case, the predicate felony for Muhammad's second-degree murder conviction was the robbery of Mora. *See* 18 Pa.C.S. § 2502(d); (Information, 10/18/15, at 1 Count 2). Thus, we agree that those two convictions should be merged for sentencing purposes. However, we also agree with the Commonwealth that Muhammad has failed to argue how the robberies of Sarmiento, Colon-Torres and Pasquel-Lopez merge into his robbery and murder of Mora, and, in fact, we agree with the Commonwealth that they do not where the convictions related to Mora did not "necessarily involve[]" the other three robberies, which relied on additional facts. (*See* Muhammad's Brief, at 20-21); (Commonwealth's Brief, at 11); *see Adams*, *supra* at 325; *Maddox*, *supra* at 1015.

Accordingly, we vacate Muhammad's sentence for his robbery of Mora only and affirm the judgment of sentence in all other respects. Because the robbery sentence was imposed to run concurrent to the life sentence for murder, vacating it does not affect the overall sentencing scheme and we need not remand for resentencing. *See Commonwealth v. Lomax*, 8 A.3d 1264, 1268 (Pa. Super. 2010) (declining to remand where vacating sentence does not upset overall sentencing scheme).

Judgment of sentence as to robbery of Mora vacated. Judgment of sentence affirmed in all other respects. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/18/21